**OYENS FEED & SUPPLY, INC., Appellant,**

v.

**PRIMEBANK, Appellee.**

No. 11–0532.

Supreme Court of Iowa.

Dec. 30, 2011.

Joel D. Vos, Lance D. Ehmcke, and Jacob B. Natwick of Heidman Law Firm, L.L.P., Sioux City, and A. Frank Baron of Baron, Sar, Goodwin, Gill & Lohr, Sioux City, for appellant.

John A. O'Brien and Brian P. Gaffney of Snell & Wilmer, L.L.P., Denver, Colorado, and Charles L. Smith and Aimee L. Lowe of Telpner, Peterson, Smith, Ruesch, Thomas & Simpson, LLP, Council Bluffs, for appellee.

Eldon L. McAfee, Mark C. Feldmann, and Julia L. Vyskocil of Beving, Swanson & Forrest, P.C., Des Moines, for amicus curiae Iowa Institute for Cooperatives.

WATERMAN, Justice.

We are asked to interpret an Iowa statute enacted in the depths of the 1980s farm crisis to help debt-laden farmers buy livestock feed on credit to continue operations. Our answer is sought to resolve a dispute between two creditors in a bankruptcy proceeding with competing liens on the same hogs. A hog producer with outstanding loans to Primebank went deeper into debt by purchasing feed on credit from Oyens Feed & Supply to fatten the hogs to market weight. We answer a certified question from the federal district court by holding Primebank's prior perfected security interest in the hogs is trumped by Oyens Feed's agricultural supply dealer lien under Iowa Code section 570A.5(3) (2009) to the extent of the enhanced value of the livestock presumptively attributable to the feed—even though the bank received no certified request under section 570A.2 before the feed was sold on credit. Our interpretation effectuates the legislative intent to protect suppliers whose feed enhances the value of livestock while honoring the security interest of the earlier lender in the original value.

## I. Background Facts and Proceedings.

This dispute between Oyens Feed and Primebank arises through Crooked Creek Corporation's chapter 12 bankruptcy in the United States Bankruptcy Court for the Northern District of Iowa. Crooked Creek is a farrow-to-finish hog producer located in Plymouth County, Iowa. Both Primebank and Oyens Feed claim liens on the proceeds of the sale of Crooked Creek's hogs. Primebank had a perfected article 9 security interest in the hogs to secure two promissory notes predating Oyens Feed's perfected section 570A.5(3) agricultural supply dealer lien in the hogs. The proceeds from the sale of the approximately 7500 hogs are insufficient to satisfy both parties' liens. Oyens Feed claims its lien trumps Primebank's security interest as to $358,841.10 of the sale proceeds. That amount is in escrow.

Crooked Creek filed an adversary proceeding to determine the priority of the liens, without taking a position as to which creditor should prevail. Oyens Feed filed an answer asking the bankruptcy court to deem its lien paramount to Primebank's interest. Primebank cross-claimed, asserting its perfected security interest in the hogs had priority. Primebank's cross-claim sought declaratory relief and damages. Primebank moved for partial sum-

mary judgment on its declaratory relief claim, asserting Oyens Feed is not entitled to superpriority under section 570A.5(3) because it failed to comply with the certified request process in section 570A.2. Oyens Feed resisted the partial summary judgment motion by arguing the superpriority rule in section 570A.5(3) operates independently of the certified request provision in section 570A.2. The bankruptcy court granted Primebank partial summary judgment on grounds that Oyens Feed failed to provide Primebank a certified request under section 570A.2.

Oyens Feed appealed the bankruptcy court's ruling to the United States District Court for the Northern District of Iowa. The Honorable Donald E. O'Brien sua sponte certified this question of law to our court:

> Is the special priority afforded agricultural supply dealer liens for livestock feed under Iowa Code § 570A.5(3) susceptible to the affirmative defense afforded financial institutions under § 570A.2(3), or does § 570A.5(3) instead operate independently of or as an exception to § 570A.2(3), so as to allow an agricultural supply dealer supplying livestock feed to obtain a lien that, pursuant to § 570A.5(3), has priority over a financial institution's prior perfected security interest in the same collateral to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater, without the dealer having complied with the requirements imposed by § 570A.2(1) and contemplated under § 570A.2(3)?

## II. Our Discretion to Answer Certified Questions.

Iowa Code section 684A.1 allows this court to answer questions of Iowa law

certified to us by a federal court that concludes controlling precedent is lacking when the answer may be determinative of the federal proceeding. *See Foley v. Argosy Gaming Co.*, 688 N.W.2d 244, 246 (Iowa 2004). No disputed fact questions complicate our analysis. The question certified to us is a purely legal issue on the interpretation of an Iowa statute that will resolve the lien priority dispute in the federal proceeding. Our state appellate courts have not decided the question, and interpretations of the statute by Iowa district courts and federal courts are in conflict. Although Primebank initially opposed certification in the federal proceeding, neither Oyens Feed nor Primebank now urges us to decline to answer the question. Amicus curiae Iowa Institute for Cooperatives, representing Iowa farmers, agricultural suppliers and businesses, notes the importance of this issue to the availability of financing for farming operations so vital to our rural communities. Accordingly, we elect to answer this question certified to us.

## III. Construction of Chapter 570A.

Chapter 570A creates an agricultural supply dealer lien. It was enacted in 1984. 1984 Iowa Acts ch. 1072, § 1. According to the senate file "Explanation," it sought "to create[ ] a lien against all livestock consuming feed, to secure payment of the retail cost of the feed that was furnished." S.F. 510 Explanation, 70th G.A. (Iowa 1984). Other legislative history is sparse. As with most Iowa statutes, there are no committee hearings or floor debates to review. Commentators contemporaneous to the chapter's enactment, however, noted, "It is generally believed that the enactment of chapter 570A of the Iowa Code was in response to the farm debt crisis" this state suffered in the 1980s. Thomas E. Salsbery & Gale E. Juhl, *Chapter 570A Crop and Livestock Lien Law: A Panacea*

*or Pandora's Box,* 34 Drake L.Rev. 361, 363 (1984–85).[1] Farmers' assets were often encumbered by lender security interests, making agricultural suppliers hesitant to sell seed, feed, or other products to farmers on credit. *Id.* at 364. The commentators suggest the legislature intended the lien to encourage the credit sale of agricultural supplies by providing the supplier a secured lien in the farmers' crops or livestock. *Id.* By increasing available credit to debt-troubled farmers from suppliers, the legislature hoped farmers could continue to operate through difficult times. *Id.* The commentators also noted, however, that "Chapter 570A is a compromise between the interests of agricultural supply dealers and financial institutions" because the chapter provides lenders protection through the certified request process. *Id.* at 387.

Chapter 570A defines "agricultural supply dealer" or "dealer" as "a person engaged in the retail sale of agricultural chemicals, seed, feed, or petroleum products." Iowa Code § 570A.1(4). Section 570A.3 creates the agricultural supply dealer lien. It provides dealers of agricultural chemicals, petroleum products, or seed a lien in crops, and it provides a feed dealer a lien in livestock that consumes the purchased feed. Section 570A.4 requires dealers to comply with article 9 perfection requirements. In 2003, chapter 570A was amended to comply with the requirements of revised article 9. Importantly, the legislature's accompanying "Explanation" states the amendment "maintains [the] pri-

ority status [of agricultural liens] over other security interests and liens." S.F. 379 Explanation, 80th G.A. (Iowa 2003).[2]

The specific provisions at issue are section 570A.5, which sets forth the lien's priority rules, and section 570A.2, which provides financial institutions with perfected security interests an affirmative defense to a dealer who fails to provide the institution with a certified request.

**A. Framing the Statutory Dispute.** Iowa Code section 570A.5 contains three priority rules. Section 570A.5 states:

> For an agricultural supply dealer lien that is perfected under section 570A.4, all of the following shall apply:
>
> 1. The lien shall have priority over a lien or security interest that applies subsequent to the time that the agricultural supply dealer lien is perfected.
>
> 2. *Except as provided in section 570A.2, subsection 3, the lien shall have equal priority* to a lien or security interest which is perfected prior to the time that the agricultural supply dealer lien is perfected. However, a landlord's lien that is perfected pursuant to section 570.1 shall have priority over a conflicting agricultural supply dealer lien as provided in section 570.1, and a harvester's lien that is perfected pursuant to section 571.3 shall have priority over a conflicting agricultural supply dealer lien as provided in section 571.3A.
>
> 3. *A lien in livestock feed shall have priority over* an earlier perfected lien or

1. The article was coauthored by counsel to the Iowa Farm Bureau Federation, an organization actively involved in the legislative process that led to the enactment of chapter 570A.

2. The amendment's primary effect was to synchronize the lien's perfection procedures with the financing statement requirements in article 9. Article 9 expressly states "agricultural

liens" are governed by state statutory law. *See* Iowa Code § 554.9302 ("While farm products are located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of an agricultural lien on the farm products."). Accordingly, the priority rules articulated in chapter 570A are unaffected by the 2003 amendments.

security interest *to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater.*

(Emphasis added.)

Section 570A.2 details the certified request process. Section 570A.2(3) provides a financial institution an affirmative defense to a dealer's enforcement of its lien. Section 570A.2(3) states:

Upon an action to enforce a lien secured under section 570A.3 against the interest of a financial institution secured to the same collateral as that of the lien, it shall be an affirmative defense to a financial institution and complete proof of the superior priority of the financial institution's lien that the financial institution either did not receive a certified request and a waiver signed by the farmer, or received the request and a waiver signed by the farmer and provided the full and complete relevant financial history which it held on the farmer making the purchase from the agricultural supply dealer on which the lien is based and that financial history reasonably indicated that the farmer did not have a sufficient net worth or line of credit to assure payment of the purchase price.

A "certified request ... state[s] the amount of the purchase and the terms of sale and [is] accompanied by a waiver of confidentiality signed by the farmer, and a fifteen dollar fee." Iowa Code § 570A.2(1). The financial institution must respond within four days. *Id.* The financial institution can elect to supply credit for the purchase. *Id.* If the institution elects not to respond to the request or declines to provide credit, then the dealer may perfect an agricultural supply lien under section 570A.3. *Id.* § 570A.2(2).

Section 570A.5 codifies three priority rules with distinct characteristics. Section 570A.5(1) gives the agricultural supply dealer lien priority over subsequent liens. Section 570A.5(2) awards all dealers "equal priority" in the entire collateral. By contrast, section 570A.5(3) provides feed dealers superiority in part of the livestock collateral—the new value presumptively attributable to the feed. Importantly, section 570A.5(2) also conditions its equal priority as applying "[e]xcept as provided in 570A.2, subsection 3"—the affirmative defense at issue here. That exception is not found in section 570A.5(3)'s superpriority provision—an omission key to answering the certified question in favor of Oyens Feed.

**B. The Arguments of the Parties and Iowa Institute for Cooperatives.** Oyens Feed argues its livestock lien trumps Primebank's security interest under section 570A.5(3) because the provision creates a superpriority rule that operates independently of the certified request, affirmative-defense provision of section 570A.2(3). Oyens Feed relies on the legislature's selective inclusion of the phrase, "Except as provided in section 570A.2, subsection 3" into section 570A.5 subsection (2), but not subsection (3). According to Oyens Feed, this selective inclusion demonstrates the legislature intended the affirmative defense to apply only to dealers claiming "equal priority" under section 570A.5(2), and not to feed dealers seeking superpriority in the new value created in livestock under section 570A.5(3). Oyens Feed supports this assertion by observing the subsections articulate different priority rules. For example, subsection (3) applies exclusively to feed dealers, awarding superpriority to the extent the livestock's acquisition value is exceeded by its value at the time the lien attached or its ultimate sale price. Since the subsections create differ-

ent priority rules, Oyens Feed claims the legislature's selective inclusion must be given effect.

Oyens Feed argues a "contrary rule would give a windfall to the lender who is not extending new value to pay for necessary feed." Livestock must be fed to mature and increase in value. According to Oyens Feed, the legislature did not intend the secured lender to improve its position through the increased value of the livestock collateral without extending additional credit for the feed that enhanced the livestock's value. The Iowa Institute for Cooperatives elaborates by arguing livestock feed suppliers are not required to comply with the certified request process because "[i]t goes without saying the livestock feed is necessary to keep livestock alive. While crop inputs are necessary for crop production, crops are not animals that will suffer and/or perish without daily feeding." Accordingly, burdening credit feed sales with procedural requirements poses harm not present in chemical, seed, and petroleum sales.

Primebank contends chapter 570A as a whole creates a uniform, balanced scheme that protects lenders and dealers through its certified request and superpriority rules. Primebank relies on the broad declaration in section 570A.2(3) that "[u]pon an action to enforce a lien secured under section 570A.3 against the interest of a financial institution secured to the same collateral ... it shall be an affirmative defense ... that the financial institution ... did not receive a certified request." Primebank argues section 570A.2(3) expressly provides financial institutions an affirmative defense to lien claims by any dealer who omits the certified request procedure, including dealers claiming superpriority under section 570A.5(3). Primebank also relies on the prefatory "all" in the introductory clause to section 570A.5.

*Id.* § 570A.5 ("For an agricultural supply dealer lien that is perfected under section 570A.4, *all* of the following shall apply.... " (Emphasis added.)). According to Primebank, that "all" requires us to read the subsections as imposing sequential and cumulative requirements such that subsection (3) is an addendum to subsection (2). This interpretation subjects the superpriority lien in subsection (3) to the affirmative defense incorporated into subsection (2)'s provision for equal priority liens. Primebank argues that, if feed suppliers are not required to complete a certified request, "the risk to financial institutions making livestock loans increases and becomes very difficult to ascertain," which will lead to a credit crunch in livestock lending.

**C. The Split in Authority Among Courts Considering the Issue.** Iowa appellate courts have not squarely decided this issue. A 1994 opinion of this court suggested, without analysis, that a feed dealer must comply with section 570A.2 before claiming superpriority under section 570A.5(3). *Wilkin Elevator v. Bennett State Bank*, 522 N.W.2d 57, 62 n. 3 (Iowa 1994). In *Wilkin*, a feed dealer sued a bank for tortious interference. *Id.* at 59. The court held the feed store had no basis to challenge the bank's action because the store never had a perfected security interest or agricultural lien in the livestock. *Id.* at 62. In a footnote, the court gratuitously stated the feed store could not prevail under section 570A because "[a]ny lien under that statute was ineffective as against the bank ... because of the feed store's failure to provide the bank with the required documentation." *Id.* n. 3. That statement was not necessary to the holding of the case and therefore is dictum. The certifying court concluded there is no controlling authority, and we agree *Wilkin* is not dispositive. We will

perform our own statutory analysis to answer this certified question.

The trial courts reaching the precise statutory question are divided in their resolution.[3] Those ruling in favor of the feed suppliers note the certified request provision is incorporated only into section 570A.5(2) but not the superpriority provision in subsection (3). For example, Iowa District Court Judge John Ackerman stated:

> To this court, it doesn't make any sense that if the provisions of § 570A.2(3) apply to all of the special priority rules set out in subsections 1, 2, and 3 of § 570A.5, why did the legislature expressly reference § 570A.2(3) [only in subsection 2].... If the provisions of § 570A.2(3) had the breadth as argued by the bank, it would not be necessary to specifically reference § 570A.2(3) in § 570A.5(2).

*Doon Elevator Co. v. Am. State Bank*, Sioux County No. LACV022572 (Iowa Dist.Ct. March 29, 2010). Judge Ackerman concluded:

> [T]he legislature intended to give a more protected status to the livestock feed sellers over the retailers of seed, chemicals, and petroleum. The priority status given to sellers of livestock feed as opposed to the equal priority given to other agricultural supply dealers and the legislature's failure to make the feed sellers' lien subject to the provisions of § 570A.2(3) evidences that intent.

*Id.*

Similarly, the United States District Court for the Eastern District of North Carolina concluded:

> [T]his court agrees with the appellant that if the Iowa legislature had wanted to subject the priority rule stated in § 570A.5(3) to the affirmative defense created by § 570A.2(3), it is clear they knew how to do that. Where the legislature includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion.... The omission of the affirmative defense language from § 570A.5(3) must be presumed to be intentional, and leads to the conclusion that § 570A.5(3) was not intended to be subject to the affirmative defense in § 570A.2(3).

*Farmers Coop. Soc'y of Sioux Center v. First Nat'l Bank of Omaha*, No. 7:10–CV–202–H (E.D.N.C. Sept. 15, 2011) (appeal pending).[4]

---

**3.** *See Farmers Coop. Soc'y of Sioux Center v. First Nat'l Bank of Omaha*, No. 7:10–CV–202–H (E.D.N.C. Sept. 15, 2011) (ruling in favor of feed supplier) (appeal pending); *In re Coastal Plains Pork, LLC*, 438 B.R. 845, 851–52 (Bankr.E.D.N.C.2010) (ruling in favor of lender), *rev'd, First Nat'l Bank of Omaha*, No. 7:10–CV–202–H (ruling in favor of feed supplier); *In re Crooked Creek Corp. v. Primebank*, 427 B.R. 500, 506, 509 (Bankr.N.D.Iowa 2010) (ruling in favor of lender) (appeal pending); *First State Bank v. Kerber Milling Co.*, Clay County No. CVCV027234 (Iowa Dist.Ct. Aug. 2, 2010) (ruling in favor of feed supplier); *Galva–Holstein Ag, LLC v. Holstein Dairy, LLP*, Ida County No. EQCV014128 (Iowa Dist.Ct. June 21, 2010) (ruling in favor of the lender); *Doon Elevator Co. v. Am. State Bank*, Sioux County No. LACV022572 (Iowa Dist.Ct. March 29, 2010) (ruling in favor of feed supplier).

**4.** Coastal Plains Pork, LLC was a North Carolina company that operated a farrow-to-finish farm that produced swine in several states, including Iowa, where it had a hog-growing operation. First National Bank of Omaha provided Coastal Plains a loan for the Iowa operations and perfected a security interest in the livestock. Coastal Plains also purchased feed from two Iowa feed suppliers. It filed for bankruptcy protection in the Eastern District of North Carolina. In an adversary proceeding, First National Bank of Omaha and the feed suppliers disputed their lien priority in the livestock. Accordingly, the dis-

By contrast, courts ruling in favor of lenders emphasize the comprehensive nature of the chapter's certified request provisions. One bankruptcy court reasoned:

[T]he Court believes that Iowa Code § 570A.5(3) cannot stand or be read alone. The rules of statutory construction require the Court to read the statute as a whole and give effect to the plain meaning of the statute, where the meaning of the statute is plain. Taken as a whole, this statute is a well organized scheme for the creation, perfection, priority and enforcement of liens to secure the sale of agricultural supplies in Iowa.

*In re Coastal Plains Pork, LLC*, 438 B.R. 845, 851–52 (Bankr.E.D.N.C.2010) (citations omitted), *rev'd, First Nat'l Bank of Omaha*, No. 7:10–CV–202–H. The bankruptcy court ruling underlying this certified question adopted similar reasoning, finding the legislature sought "to strike a balance among the various stakeholders, ... including the holders of statutory liens and creditors holding Article 9 security interests other than financial institutions." *In re Crooked Creek Corp.*, 427 B.R. 500, 506, 509 (Bankr.N.D.Iowa 2010). The court concluded feed dealers must comply with the certified request process to attain superpriority status. *Id.* at 509.

■■■ **D. Construction.** In resolving statutory disputes, "our ultimate goal is to ascertain and give effect to the intent of the legislature." *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Mobil Oil Corp.*, 606 N.W.2d 359, 363 (Iowa 2000). "We look to both the language and the purpose behind the statute." *Id.* When construing a statute, we assess the statute as a whole, not just isolated words or phrases. *In re Conser-*

*vatorship of Alessio*, 803 N.W.2d 656, 661 (Iowa 2011). Guided by well-established principles of statutory construction, we hold Oyens Feed can claim superpriority under section 570A.5(3) without complying with the certified request process in section 570A.2.

■■■ "[L]egislative intent is expressed by omission as well as by inclusion of statutory terms." *Freedom Fin. Bank v. Estate of Boesen*, 805 N.W.2d 802, 812 (Iowa 2011); *accord Chesnut v. Montgomery*, 307 F.3d 698, 701–02 (8th Cir.2002) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17, 24 (1983))). The legislature selectively incorporated the prefatory clause, "Except as provided in section 570A.2, subsection 3," into section 570A.5 subsection (2) but not subsection (3). We presume this clause was located in subsection (2) for a reason—to apply the affirmative defense solely to the equal priority lien recognized in that subsection.

■■■ The phrase "[e]xcept as provided in subsection 570A.2" would be redundant or surplusage if section 570A.2(3)'s affirmative defense applied to all subsections of section 570A.5. "When interpreting the meaning of the statute, we give effect to all the words in the statute unless no other construction is reasonably possible." *State v. Osmundson*, 546 N.W.2d 907, 910 (Iowa 1996). We decline Primebank's invitation to view section 570A.5(3) as an addendum subject to the affirmative defense incorpo-

---

pute over the meaning of Iowa chapter 570A made its way to federal court on the Atlantic Coast.

rated in subsection (2). The subsections recognize distinct liens. The superpriority lien in section 570A.5(3) applies only to the new value presumably created by the feed, not the acquisition value of the livestock subject to the lender's security interest. The interpretation sought by Oyens Feed and the Iowa Institute for Cooperatives, by limiting the affirmative defense to the equal priority lien, harmonizes and gives effect to all terms in the relevant sections.

In *Boesen*, we found the legislature's selective inclusion of the phrase "not necessary for the payment of debts and charges" to be dispositive in resolving whether an intestate surviving spouse receives real property free and clear of her husband's debts. *Boesen*, 805 N.W.2d at 812. The statute at issue, section 633.211, provided the spouse in subsection (1) "[a]ll the value of ... real property" while an adjacent subsection provided only the "personal property ... not necessary for the payment of debts and charges." *Id.* We observed: "If the legislature intended to subordinate the surviving spouse's real property interest to the decedent's debts, it would have expressly said so, as it did in subpart 3 with nonexempt personal property." *Id.* We find this reasoning applicable here. If the legislature had intended to subordinate a dealer's priority under section 570A.5(3), it would have expressly said so as it did in subsection (2). The Eastern District of North Carolina utilized the same reasoning to resolve this issue. *First Nat'l Bank of Omaha*, No. 7:10–CV–202–H ("Where the legislature includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion.").

■ Another principle of statutory construction buttresses our conclusion. "To the extent 'there is a conflict or ambiguity between specific and general statutes, the provisions of specific statutes control.'" *Boesen*, 805 N.W.2d at 815 (quoting *Goergen v. State Tax Comm'n*, 165 N.W.2d 782, 787 (Iowa 1969)); *see also* Iowa Code § 4.7. Section 570A.1 separately defines "petroleum products," "seed," "agricultural chemicals," and "feed." Section 570A.3 distinguishes between crop collateral from the sale of petroleum, seed, and chemicals and livestock collateral from feed sales. Section 570A.5(1) and (2) articulate general priority rules that apply to all of those agricultural supplies and to crops and livestock collateral. Section 570A.5(3), however, articulates a specific priority rule applicable only to livestock feed and the resulting new value. This specific superpriority provision prevails over the general provisions.

It makes sense the legislature would give superpriority status to livestock feed suppliers limited to the new value created, without requiring compliance with the certified request procedure. Livestock feed is often supplied on an ongoing basis, and it would be impractical and cumbersome to require serial certified requests with ever-changing dollar amounts and recurring fees. Livestock feed is grown and sold by farmers. The legislature presumably sought to encourage a fluid feed market without burdening cooperatives and farmers with the certified request process. By contrast, sales of crop seed, herbicides, and fertilizer are more often bulk transactions by large vendors for whom the certified request process is less cumbersome.

Importantly, the superpriority provision only allows feed suppliers to trump perfected secured lenders to the extent the acquisition value of the livestock is exceeded by the livestock's value at the time the lien attaches or its ultimate sale price. Accordingly, the secured lender generally retains its secured position up

to the livestock's acquisition price. The feed supplier's superpriority corresponds to the livestock's increase in value that typically results from consuming feed. The legislature reasonably could conclude the feed supplier who made the credit sale, not the secured lender, should be entitled to superpriority in this new value. This interpretation furthers the legislature's goal to encourage feed sales to livestock producers already burdened with bank debt. North Dakota similarly allows feed suppliers a superpriority lien without requiring a certified request or notice to prior lenders. N.D. Cent.Code § 35–31–03 (West, Westlaw through 2011 Reg. Special Sess.) ("An agricultural supplier's lien obtained under the provisions of this chapter has priority, as to the crops or agricultural products covered thereby, over all other liens or encumbrances except any agricultural processor's lien.").[5]

## IV.  Conclusion.

We hold section 570A.5(3) creates a superpriority rule independent of the chapter's certified request provisions; accordingly, Oyens Feed did not have to comply with section 570A.2 in order to achieve superpriority status under section 570A.5(3). Costs in this court are assessed against Primebank.

**CERTIFIED QUESTION ANSWERED.**

---

5.  Other state legislatures have chosen a different policy for their state. *See, e.g.,* Kan. Stat. Ann. § 58–243(b) (West, Westlaw through 2011 Reg. Sess.) ("[T]he [livestock] lien shall have priority over a security interest of a lender only if perfected and if the supplier notifies the lender of such supplier's lien pursuant to K.S.A. 58–242."); Minn.Stat. Ann. § 514.966(3)(b) (West, Westlaw through 2011 First Spec. Sess.) (requiring feed dealer to provide lender a "lien-notification statement" before obtaining lien); Neb.Rev.Stat. Ann. § 54–208 (West, Westlaw through 2011 First Reg. Sess.) (stating the lien "shall be a first, paramount, and prior lien if the holders of any prior liens have agreed in writing to the contract for the feed or feed ingredients and related delivery cost").