# IN THE SUPREME COURT OF IOWA

No. 15–0806

Filed May 27, 2016

Amended July 27, 2016

**OYENS FEED & SUPPLY, INC.,**

Appellant,

vs.

**PRIMEBANK,**

Appellee.

Certified questions of law from the United States District Court for the Northern District of Iowa, Donald E. O'Brien, United States Senior District Court Judge.

A federal district court certified two questions of law in a priority dispute between competing creditors of a bankrupt hog operation. **CERTIFIED QUESTIONS ANSWERED.**

Joel D. Vos and James W. Redmond of Heidman Law Firm, L.L.P., Sioux City, and A. Frank Baron of Baron, Sar, Goodwin, Gill & Lohr, Sioux City, for appellant.

Scott C. Sandberg and John O'Brien of Snell & Wilmer, L.L.P., Denver, Colorado, and Charles L. Smith and Nicole Hughes of Telpner, Peterson, Smith, Ruesch, Thomas & Simpson, L.L.P., Council Bluffs, for appellee.

Robert L. Hartwig, Johnston, for amicus curiae Iowa Bankers Association.

**HECHT, Justice.**

Crooked Creek Corporation operated a farrow-to-finish hog facility where it bred gilts and sows and raised their litters for slaughter. *See Ballard v. Amana Soc'y, Inc.,* 526 N.W.2d 558, 559 (Iowa 1995) (per curiam) (explaining the term "farrow-to-finish hog operation"); *see also* Iowa Code § 459.102(46) (2009) (defining "swine farrow-to-finish operation" for animal agriculture compliance purposes). After the company filed for bankruptcy, the hogs were sold, but the sale did not generate enough money to pay off competing liens asserted by two of Crooked Creek's creditors—Oyens Feed & Supply, Inc. and Primebank. Today we determine the creditors' relative priority in the remaining sales proceeds by answering two questions of law a federal district court certified to us.

## I. Background Facts and Proceedings.

This case is before us for a second time. *See Oyens Feed & Supply, Inc. v. Primebank,* 808 N.W.2d 186, 195 (Iowa 2011) (answering a previous certified question from the United States District Court for the Northern District of Iowa). Our previous decision sets forth the relevant facts:

> This dispute between Oyens Feed and Primebank arises through Crooked Creek Corporation's chapter 12 bankruptcy in the United States Bankruptcy Court for the Northern District of Iowa. Crooked Creek is a farrow-to-finish hog producer located in Plymouth County, Iowa. Both Primebank and Oyens Feed claim liens on the proceeds of the sale of Crooked Creek's hogs. Primebank had a perfected article 9 security interest in the hogs to secure two promissory notes predating Oyens Feed's . . . section 570A.5(3) agricultural supply dealer lien in the hogs. The proceeds from the sale of the approximately 7500 hogs are insufficient to satisfy both parties' liens.

*Id.* at 187. Although the proceeds from the sale are insufficient to satisfy both parties' liens, $342,371.78 remains in escrow pending our resolution of the parties' competing claims.

Oyens Feed holds an agricultural supply dealer lien because it sold Crooked Creek feed "on credit . . . to fatten the hogs to market weight." *Id.* Livestock feed is an agricultural supply, *see* Iowa Code § 570A.1(3), and "[a]n agricultural supply dealer who provides an agricultural supply to a farmer shall have an agricultural lien," *id.* § 570A.3. In our 2011 decision, we concluded Oyens Feed was entitled to superpriority in at least some of the sales proceeds of Crooked Creek's hogs even though it had not followed the statutory certified request procedure for notifying financial institutions of intent to provide a debtor with agricultural supplies on credit. *Oyens Feed,* 808 N.W.2d at 194–95. Because our decision did not resolve the amount of proceeds in which Oyens Feed had superpriority, the parties returned to the bankruptcy court for a trial to establish the extent of each party's entitlement.

At trial, Oyens Feed claimed it was entitled to all of the escrowed funds because its agricultural supply dealer lien has superpriority over Primebank's earlier perfected security interest. *See* Iowa Code § 570A.5(3). However, Primebank contended Oyens Feed is not entitled to the entire escrow amount.

First, Primebank asserted Oyens Feed had not properly perfected a lien for the entire amount of feed sold because it had not filed a financing statement "within thirty-one days after" each date Crooked Creek purchased feed. *Id.* § 570A.4(2); *see id.* § 570A.5 (granting priority to "an agricultural supply dealer lien that is perfected under section 570A.4"); *In re Shulista,* 451 B.R. 867, 874 (Bankr. N.D. Iowa 2011) ("[S]uper priority is allowed . . . only insofar as the supply dealer has *perfected* its

lien."); James J. White & Robert S. Summers, *Uniform Commercial Code* § 21–8, at 738 (5th ed. 2000) [hereinafter White & Summers] ("[Article 9 of the Uniform Commercial Code] grants potential super priority only to a 'perfected agricultural lien.' "). Oyens Feed filed only two financing statements, one on May 28 and the other on August 14, 2009. Thus, Primebank contended Oyens Feed had only perfected its supply dealer lien for the thirty-one-day periods immediately preceding the filing of each of its financing statements, meaning it only had priority in, at most, the amount of funds equaling the price of feed sold between April 27 and May 28 and between July 14 and August 14.

Second, Primebank noted that under the statute, Oyens Feed only has priority "to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater." Iowa Code § 570A.5(3); *see Oyens Feed*, 808 N.W.2d at 194. Although all of Crooked Creek's pigs came from gilts and sows it raised from birth and bred, Primebank asserted the acquisition price of the animals could not be zero because the acquisition price must include costs of feed, labor, transportation, facilities depreciation, utilities, and semen. As Primebank put it, "the pigs do not magically appear."

The bankruptcy court concluded the plain meaning of section 570A.4 creates a "discrete window of time," beginning with the farmer's purchase of feed and ending thirty-one days later, within which an agricultural supply dealer must file a financing statement to perfect its lien. *Shulista*, 451 B.R. at 876; *accord In re Schley*, 509 B.R. 901, 908 (Bankr. N.D. Iowa 2014) ("[A]ny superpriority lien . . . would be limited under § 570A.4(2) to the 31 days before [the party asserting an agricultural supply dealer lien] filed a financing statement."); *cf. Caster v.*

*McClellan*, 132 Iowa 502, 506–07, 109 N.W. 1020, 1021 (1906) (declining to "extend the force of the enactment beyond the field marked out by the language employed" because "[i]f . . . there should be an extension of the lien right, it is for the Legislature to make provision therefor in clear and unmistakable terms"). "If additional feed is sold after the . . . 31-day period, another financing statement must be filed within 31 days of sale to perfect the lien on that transaction." *Shulista*, 451 B.R. at 877; *see also In re Big Sky Farms Inc.*, 512 B.R. 212, 219–20 (Bankr. N.D. Iowa 2014) (concluding *Shulista* remains good law after our previous *Oyens Feed* decision). Accordingly, the bankruptcy court concluded Oyens Feed had only perfected its lien as to amounts for feed delivered in the thirty-one days preceding the filing of each of its financing statements. *See Schley*, 509 B.R. at 908 (setting a maximum recovery under analogous circumstances of the "total amount of feed supplied during the 31 days prior to the first and second filings"). The court found Oyens Feed perfected its lien in $156,367.43 of the escrowed funds and the remainder of its lien was unsecured.

In reaching its decision on the extent of Oyens Feed's lien in the escrowed funds, the bankruptcy court reasoned the acquisition price of the hogs was zero because Crooked Creek raised hogs from birth rather than purchasing them. The court concluded "the 'purchase price' comprises the vast majority, if not all of, the 'acquisition price' for . . . purposes of Iowa Code § 570A.5(3)." In adopting this formulation of "acquisition price," the court rejected Primebank's contention that acquisition price includes all expenses prorated per hog. Further, the court concluded that while chapter 570A imposes some important limitations on feed suppliers' priority—for example, a thirty-one-day filing period—the legislature could not have intended to make feed suppliers

engage in an elaborate accounting process to demonstrate the extent of their priority. *Cf. Oyens Feed*, 808 N.W.2d at 194 (declining to require feed suppliers to engage in an "impractical and cumbersome" certified request process because "[t]he legislature presumably sought to encourage a fluid feed market without burdening cooperatives and farmers"). The bankruptcy court awarded Oyens Feed $156,367.43 of the escrowed funds and awarded Primebank the remainder.

Both parties appealed to the federal district court. *See* 28 U.S.C. § 158(a)(1) (2012) (vesting federal district courts with jurisdiction to hear appeals from final judgments and orders in cases and proceedings referred to bankruptcy judges). Oyens Feed appealed the determination that chapter 570A requires agricultural supply dealers to file a new financing statement to perfect a lien for additional feed sold after filing the first financing statement. Primebank appealed the determination that the acquisition price for livestock born in Crooked Creek's farrow-to-finish facility is zero. A federal magistrate recommended that the district court certify two questions of law to us.

The United States District Court for the Northern District of Iowa adopted the magistrate's recommendation and certified the following questions:

> 1. Pursuant to Iowa Code section 570A.4(2), is an agricultural supply dealer required to file a new financing statement every thirty-one (31) days in order to maintain perfection of its agricultural supply dealer's lien as to feed supplied within the preceding thirty-one (31) day period?

> 2. Pursuant to Iowa Code section 570A.5(3), is the "acquisition price" zero when the livestock are born in the farmer's facility?

## II.  The Parties' Positions.

**A.  Oyens Feed.**  Oyens Feed asserts the answer to question one is "no" and the answer to question two is "yes."  It contends the word "within" in section 570A.4 is ambiguous and asserts we should resolve that ambiguity by holding once an agricultural supply dealer initially perfects its lien, the lien remains continuously perfected both as to the initial amount and as to any future amounts the feed supplier provides.  Oyens Feed acknowledges the bankruptcy court reached a contrary conclusion in *Shulista*, but it asserts *Shulista* was wrongly decided.

Oyens Feed's quarrel with *Shulista* is multifaceted.  First, it asserts *Shulista* ignores an express reference to prospective filing in the general provisions of chapter 554—Iowa's version of the Uniform Commercial Code (UCC).  *See* Iowa Code § 554.9308(2) ("An agricultural lien is perfected when it becomes effective if the applicable requirements are satisfied before the agricultural lien becomes effective.").  Second, Oyens Feed contends requiring a feed supplier to file serial financing statements is impractical and cumbersome, and we rejected an impractical and cumbersome process in our prior decision in this case.  *See Oyens Feed*, 808 N.W.2d at 194.  *But see Big Sky Farms*, 512 B.R. at 220–21 (concluding the certified request process and the process of filing financing statements "are in fact very different" because a feed supplier filing a financing statement may act unilaterally).

Oyens Feed further contends *Shulista* wrongly attributed material significance to a 2003 amendment that removed forward-looking language from chapter 570A.  *See Shulista*, 451 B.R. at 877; *see also* 2003 Iowa Acts ch. 82, § 5.  Before the 2003 amendment, chapter 570A provided a method through which an agricultural supply dealer could perfect a lien for the amount of "the agricultural [supply] which has been

*or may be* furnished." Iowa Code § 570A.4(1)(*b*) (2001) (emphasis added). Oyens Feed points to the billbook explanation for the 2003 amendment, which states the amendment *maintained* agricultural liens' priority status. S.F. 379, 80th G.A., 1st Sess. explanation (Iowa 2003); *see Oyens Feed*, 808 N.W.2d at 189 (referring to this explanation in tracing the history of chapter 570A). Asserting the bankruptcy court's interpretation of current section 570A.4 diminishes the priority status of agricultural supply dealers' liens by limiting the perfecting effect of a financing statement to a period of thirty-one days before filing, Oyens Feed contends the court misunderstood the legislative intent underlying the 2003 amendment.

Finally, Oyens Feed relies upon a 1945 probate case for a definition of "within" that suggests the word only sets an end date, not a start date, for determining whether a financing statement was timely filed. *See Jensen v. Nelson*, 236 Iowa 569, 572, 19 N.W.2d 596, 598 (1945).

**B. Primebank.** Primebank asserts the answer to question one is "yes" and the answer to question two is "no." On the first question, it contends the plain meaning of the phrase "within thirty-one days after" sets both a start and end date for the perfection period, and thus, there is no ambiguity and no need to delve into legislative history, apply rules of statutory construction, or interpret the word "within."

On the second question, Primebank contends the bankruptcy court erroneously ignored or diminished the significance of acquisition price in the agricultural lien scheme. Primebank distinguishes between the "purchase price" of Crooked Creek's hogs, which it concedes is zero under the circumstances presented here, and the "acquisition price," the phrase in section 570A.5(3) (2009). In other words, Primebank asserts

the word acquisition must mean something different from the word purchase.

### III.  Power to Answer Certified Questions.

We may answer certified questions of law when a federal court or another state's appellate court has before it a case in which questions of Iowa law may be determinative and the certifying court can find no controlling Iowa precedent.  Iowa Code § 684A.1.  As the bankruptcy court has noted, there is no controlling Iowa precedent on the questions presented in this case because we did not address the "within thirty-one-days" language of section 570A.4 in our prior *Oyens Feed* decision.  *Big Sky Farms*, 512 B.R. at 219–20.  Additionally, as before, the questions certified to us are "purely legal issue[s] on the interpretation of . . . Iowa statute[s] that will resolve the lien priority dispute."  *Oyens Feed*, 808 N.W.2d at 188.  "To resolve these issues, we are faced with the weighty task of determining the working relationship between . . . agricultural liens and Revised Article 9 of the UCC."  *Stockman Bank of Mont. v. Mon-Kota, Inc.,* 180 P.3d 1125, 1133 (Mont. 2008).  Both parties urge us to answer the questions.  Accordingly, we elect to do so.  *See Oyens Feed*, 808 N.W.2d at 188.

### IV.  Analysis.

Oyens Feed holds an agricultural supply dealer lien—one of many types of agricultural liens that have caused "much confusion for those involved in agricultural financing."  Wyatt P. Peterson, Note, *Revised Article 9 and Agricultural Liens: An Iowa Perspective*, 8 Drake J. Agric. L. 437, 447 (2003) [hereinafter Peterson]; *see also* Keith G. Meyer, *A Garden Variety of UCC Issues Dealing with Agriculture,* 58 U. Kan. L. Rev. 1119, 1120 (2010) ("Producers, lenders, lawyers, and courts continue to grapple with problems connected with agriculture credit.").  Article 9

security interests and agricultural liens are distinct devices protecting those who extend credit in different contexts. *See Stockman Bank*, 180 P.3d at 1134. "A farm lender who acquires a 'security interest' through a 'security agreement' . . . has a security interest, not an agricultural lien." White & Summers § 21–8, at 737; *accord In re Coastal Plains Pork, LLC*, No. 09-08367-8-RDD, 2012 WL 6571102, at *9 n.15 (Bankr. E.D.N.C. Dec. 17, 2012) (applying Iowa Code chapter 570A and noting "the lien created is statutory, not consensual," meaning "[n]o security agreement is required"); *Stockman Bank*, 180 P.3d at 1134 ("Critical to an accurate reading of the agricultural lien provisions within Revised Article 9 is an understanding that *agricultural liens are not security interests*."); *see also* Iowa Code § 554.9102(1)(*e*) (defining "agricultural lien" as an interest "other than a security interest").

To answer the certified questions, we must interpret statutory provisions in Iowa Code chapter 570A. Our principles of statutory construction are well established:

> When the plain language of a statute . . . is clear, we need not search for meaning beyond the statute's express terms. We may presume the words contained within a statute have the meaning commonly attributed to them. We can resort to rules of statutory construction, however, when a statute's meaning is ambiguous. "A statute is ambiguous if reasonable persons could disagree as to its meaning."

*Exceptional Persons, Inc. v. Iowa Dep't of Human Servs.*, 878 N.W.2d 247, 251 (Iowa 2016) (citations omitted) (quoting *Remer v. Bd. of Med. Exam'rs*, 576 N.W.2d 598, 601 (Iowa 1998)).

**A. Question One: Perfecting the Feed Supplier Lien.** "[P]erfection is the process a creditor uses to establish its priority in relation to other creditors of the debtor in the same collateral by giving notice of its interest." *Stockman Bank*, 180 P.3d at 1137. Iowa Code

section 570A.4 sets forth the requirements for perfecting an agricultural supply dealer lien. The relevant provisions of section 570A.4 are as follows:

> Except as provided in this section, a financing statement filed to perfect an agricultural supply dealer lien shall be governed by chapter 554, article 9, part 5, in the same manner as any other financing statement.
>
> 1. The lien becomes effective at the time that the farmer purchases the agricultural supply.
>
> 2. In order to perfect the lien, the agricultural supply dealer must file a financing statement in the office of the secretary of state as provided in section 554.9308 within thirty-one days after the date that the farmer purchases the agricultural supply. . . . Filing a financing statement as provided in this subsection satisfies all requirements for perfection of an agricultural lien as provided in chapter 554, article 9.

Iowa Code § 570A.4.

Ambiguity arises "when reasonable persons could disagree as to [a statute's] meaning. *Naumann v. Iowa Prop. Assessment Appeal Bd.*, 791 N.W.2d 258, 261 (Iowa 2010). As we recognized in *Jensen*, the word "within" "is fairly susceptible of different meanings." *Jensen*, 236 Iowa at 572, 19 N.W.2d at 598. Accordingly, we conclude section 570A.4(2) is ambiguous and proceed to apply our rules of statutory construction to resolve the ambiguity.

1. *Relationship between chapter 554 and chapter 570A.* Oyens Feed contends section 570A.4's express incorporation of section 554.9308 compels the conclusion that it needed to file only one financing statement to perfect its lien for all of Crooked Creek's feed purchases—including those occurring after the first financing statement was filed on May 28, 2009. Section 554.9308(2) provides,

> An agricultural lien is perfected if it has become effective and all of the applicable requirements for perfection in section

> 554.9310 have been satisfied. An agricultural lien is perfected when it becomes effective if the applicable requirements are satisfied before the agricultural lien becomes effective.

Iowa Code § 554.9308(2). In turn, section 554.9310 simply states that, with some exceptions not applicable to agricultural liens, "a financing statement must be filed to perfect all security interests and agricultural liens." *Id.* § 554.9310(1); *see* White & Summers § 21–8, at 738 ("With respect to perfection, section 9–310 makes no concessions to the agricultural lien."). Thus, because chapter 554 contemplates agricultural liens that are perfected immediately when they become effective, and chapter 570A refers to that portion of chapter 554, Oyens Feed contends a single financing statement perfects an agricultural supply dealer's lien for the value of any feed sold after the dealer files a financing statement. We disagree.

Chapter 554 contains general provisions that act as default settings. But the legislature can supersede the general provisions with more specific guidelines or different rules in statutes with narrower scope—as it has in chapter 570A. *See* Iowa Code §§ 570A.4–.5 (applying some article 9 provisions to agricultural supply dealer liens "[e]xcept as provided in this section"). Commentators have noted that references to agricultural liens within article 9 do not establish article 9 as the principal source of rules governing them. *See* Robert D'Agostino & Bruce Gordon Luna II, *The U.C.C. and Perfection Issues Relating to Farm Products*, 35 N. Ill. U. L. Rev. 169, 173 (2014) ("The governance and creation of agricultural liens . . . are still relegated to the related non-U.C.C. state statute that creates an agricultural lien."); *see also* White & Summers § 21–8, at 738 ("[T]he agricultural lien has one foot in Article 9 and one foot outside of it."). Instead, the reason for including agricultural

liens among those that are perfected by filing a financing statement "was to eliminate secret liens by requiring a public filing." Keith G. Meyer, *A Potpourri of Article 9 Issues*, 8 Drake J. Agric. L. 323, 333 (2003); *see also* Peterson, 8 Drake J. Agric. L. at 441–42 (noting the reason for including agricultural liens within article 9 was to eliminate uncertainty in lenders' secured status).

Thus, although chapter 570A incorporates some provisions of chapter 554, to the extent there is a conflict between them, chapter 570A prevails if it requires something more to perfect an agricultural supply dealer's lien. *See* Iowa Code § 570A.4(2) ("Filing a financing statement *as provided in this subsection* satisfies all requirements for perfection of an agricultural lien as provided in chapter 554, article 9." (Emphasis added.)); *Shulista*, 451 B.R. at 880 (giving chapter 570A's terms "priority over the general UCC standards"); *cf.* Iowa Code § 554.9322(7) ("A perfected agricultural lien . . . has priority over a conflicting security interest in or agricultural lien on the same collateral *if the statute creating the agricultural lien so provides*." (Emphasis added.)).

The language of section 570A.4 conflicts with the language of section 554.9308(2). Although section 570A.4(2) refers to the "perfected when effective" language of section 554.9308(2), that reference is followed by the limiting phrase requiring a supply dealer to file a financing statement "within thirty-one days after the date that the farmer purchases the agricultural supply." *Id.* § 570A.4(2). We conclude the phrase "within thirty-one days after" creates a rule that is specific to agricultural supply dealer liens and that modifies the general agricultural lien rule. In other words, the phrase makes the second sentence of section 554.9308(2) inapplicable to agricultural supply dealer liens. *Compare id., with id.* § 554.9308(2). The context-specific rule defeats the

general rule when a conflict arises.  *Id.* § 4.7; *Oyens Feed*, 808 N.W.2d at 194.

2. *Legislative history.*  Having clarified the relationship between Code chapters, we now turn to examine Oyens Feed's assertion that the billbook explanation for the 2003 amendments to chapter 570A supports its position in this case.  *See* Iowa Code § 4.6(3), (7) (permitting courts to consider "legislative history" and a statute's "preamble or statement of policy" in resolving ambiguity).  We conclude Oyens Feed's reliance on the explanation that states amendments to chapter 570A would "maintain" the prior law is misplaced.

Removing potentially dispositive language from a statute through the amendment process is material even if the legislature does not expressly indicate that it is.  *See Orr v. Lewis Cent. Sch. Dist.*, 298 N.W.2d 256, 260–61 (Iowa 1980) (concluding the legislature materially amended a statute despite no "indication that a substantive change in the law was intended" because it "removed the language which had been determinative" in a prior case).  Here, the legislature clearly removed the phrase in the pre-2003 statute that authorized filings covering amounts for supplies that "may be furnished."  *Compare* Iowa Code § 570A.4(1)(*b*) (2001), *with id.* § 570A.4(2) (2009).

But even accepting as true Oyens Feed's contention that the legislature intended the 2003 amendments merely to maintain the previous lien priority framework for agricultural supply dealers, the interpretation of section 570A.4 advanced by Oyens Feed is unpersuasive.  Indeed, the interpretation advanced would in our view substantially expand the priority afforded such dealers under the pre-2003 framework.  Under Oyens Feed's interpretation of the statute as amended, an agricultural supply dealer's lien is transformed into a

temporally unbounded and indefinite superpriority not only for a farmer's purchases of supplies from the dealer within thirty-one days before the dealer files a financing statement, but also for purchases made any time thereafter.

Before the 2003 amendment of chapter 570A, agricultural supply dealers were not required to file financing statements to establish their liens. They were required instead to "file a verified lien statement" to perfect their liens. Iowa Code § 570A.4(1) (2001). All lien statements were required to include "[a]n itemized declaration of the . . . retail cost of the agricultural [supply] which has been or may be furnished" and note "[t]he last date through which the agricultural supply dealer . . . agreed to furnish agricultural" supplies. *Id.* § 570A.4(1)(*b*)–(*c*). Thus, agricultural supply dealers seeking superpriority over a previously perfected security interest, *see id.* § 570A.5(3), before the 2003 amendment were required to disclose both the value and the clear temporal limits of their liens.

By contrast, a supply dealer filing a financing statement under current law need only disclose its own name, "the name of the debtor," and a description of "the collateral covered by the financing statement." *Id.* § 554.9502(1) (2009); *see id.* § 570A.4 ("[A] financing statement filed to perfect an agricultural supply dealer lien shall be governed by chapter 554, article 9, part 5 . . . ."). Unlike the lien statements required before the 2003 amendment, financing statements required by current law do not disclose the amount of the claimed lien or the chronological period during which agricultural supplies were—or are in the future to be—sold. This significant change in the substance of the notice required of agricultural supply dealers is inconsistent with Oyens Feed's assertion that the legislature intended the 2003 amendment merely to integrate

chapter 554 and pre-2003 chapter 570A without making substantive changes—unless section 570A.4 as amended includes a filing requirement that maintains temporal and value limitations on supply dealers' liens. Put another way, if we were to assume, as Oyens Feed urges, that the legislature intended the 2003 amendment would "maintain" the priority framework previously enjoyed by agricultural supply dealers, we conclude the assumption would augur in favor of Primebank's interpretation of section 570A.4. *See* Iowa Code § 4.6(4) (permitting courts resolving statutory ambiguity to consider "former statutory provisions, including laws upon the same or similar subjects").

"Chapter 570A is a compromise between the interests of agricultural supply dealers and financial institutions." Thomas E. Salsbery & Gale E. Juhl, *Chapter 570A Crop and Livestock Lien Law: A Panacea or Pandora's Box*, 34 Drake L. Rev. 361, 387 (1985) [hereinafter Salsbery & Juhl]; *see also In re Crooked Creek Corp.*, 427 B.R. 500, 506 (Bankr. N.D. Iowa 2010) (stating "the legislature tried to strike a balance among the various stakeholders," protecting feed suppliers in some instances and financial institutions in others), *overruled on other grounds by Oyens Feed*, 808 N.W.2d at 195; Peterson, 8 Drake J. Agric. L. at 445 (concluding the legislature intended to protect agricultural supply dealers but also enacted "more notice and filing requirements than had been previously required [for] agricultural liens"). We conclude the bankruptcy court's decision in *Shulista* correctly balances this compromise. *See Shulista*, 451 B.R. at 876. In the agricultural supply dealer's lien context, any increased burden arising from a requirement that agricultural supply dealers file serial financing statements is "fairly . . . considered as a reasonable exchange for the super-priority status the filing helps to acquire." *Id.* at 881.

3. *The word "within."* As we have noted, Oyens Feed asserts the word "within" in section 570A.4 supports its contention that an agricultural supply dealer's lien can be perfected by filing a financing statement either before or after a farmer purchases an agricultural supply so long as the filing occurs within thirty-one days after the initial purchase for which the lien is claimed. Although we do not resolve this case solely with "plain language" analysis, we conclude the sometimes elastic meaning of the word "within" would stretch beyond the breaking point if applied as Oyens Feed suggests. *See Farmers Coop. Elevator Co. v. Union State Bank*, 409 N.W.2d 178, 181 (Iowa 1987) (rejecting a creditor's argument that, "although creative, stretches the [statutory] language . . . beyond our interpretation guideposts").

In *Jensen*, we addressed a will's charitable bequest of property to the county when the will specified the gift was to be made if the county built a new courthouse "within ten years after [the testator's] death." *Jensen*, 236 Iowa at 570, 19 N.W.2d at 597. The county in fact built a new courthouse, but it did so "between the making of the will and testator's death." *Id.* at 571, 19 N.W.2d at 597. The testator's heirs contended the charitable bequest failed because the county had built the courthouse too early. *See id.*

We acknowledged the meaning of the word "within" was the "vital question." *Id.* at 572, 19 N.W.2d at 598. We explored several definitions:

> In fixing time, this word is fairly susceptible of different meanings. It may be taken to fix both the beginning and end of the period of time in which a specified act must be done. In this sense "within" means "during."
>
> However, "within" frequently means "not beyond, not later than, any time before, before the expiration of." In this sense "within" fixes the end but not the beginning of a period of time. This meaning is neither unusual nor strained and is well recognized in law.

*Id.* (citation omitted). We chose to apply the latter meaning in *Jensen* because courts favor charitable bequests and honoring the bequest plainly carried out the testator's intent. *See id.* at 571–72, 19 N.W.2d at 598. Oyens Feed urges us to apply that meaning once again in this context.

However, we recognized in *Jensen* that sometimes the word within "may be taken to fix both the beginning and end of the period of time." *Id.* at 572, 19 N.W.2d at 598. Our decision in *Johnson v. Brooks*, 254 Iowa 278, 286–87, 117 N.W.2d 457, 461–62 (1962), illustrates one example. In *Johnson*, the plaintiff mailed the defendant a notification of filing before actually filing their petition. *Id.* at 280, 117 N.W.2d at 458–59. Yet the relevant statute required plaintiffs to send the notification "within ten days after" filing. *Id.* at 281–82, 117 N.W.2d at 459. The plaintiff served a second notification after filing the petition, but that notification was outside the prescribed limit of ten days. *See id.* at 280–81, 117 N.W.2d at 458–59. The defendant raised a statute of limitations defense, contending the first notification was too early and the second was too late. *Id.* at 281, 117 N.W.2d at 459.

We agreed. We found no basis for holding that a notification "is sufficient if it states that a copy of the original notice *will* be filed . . . . If such was the intention of the legislature, it could have and would have so provided." *Id.* at 284, 117 N.W.2d at 461. Although the plaintiff cited *Jensen*, we explained *Jensen* was not controlling because setting both a beginning and end of the temporal window for the timely filing of original notices was vital to protecting other parties under the circumstances. *See id.* at 286, 117 N.W.2d at 462 ("[A]s used in this statute, filing of the copy of the original notice is made a condition to the validity of the notice to defendant."). We concluded,

> The statute clearly requires the [plaintiff] to notify the defendants that the copy of the original notice *has* already been filed . . . , and from the time of that filing [plaintiff] had only ten days to properly notify the defendants. Thus we have a significant commencement date as well as terminus date fixed by the words of the statute, which is the polestar for its true meaning in such matters.

*Id.* at 286–87, 117 N.W.2d at 462. Our understanding of the word "within" in *Johnson* has persuasive force in this case as well. We conclude a feed supplier's financing statement gives notice that the supplier's lien has—not will—become effective. *Cf. Lydick v. Smith*, 266 N.W.2d 208, 210 (Neb. 1978) ("[I]t is not . . . compliance with the statute to give notice of something which has not yet been done.").

Furthermore, a meaning of "within" that fixes both the beginning and end of a period for filing agricultural supply dealer lien financing statements seems most appropriate when the language of section 570A.4 is contrasted with other statutory language in chapter 554 governing secured transactions in other contexts. Two provisions of chapter 554 require action within a certain number of days after some event—but by necessity demarcate the event itself as a starting point. *See* Iowa Code § 554.9317(5) (giving priority to a purchase-money security interest perfected with a financing statement filed "before or within twenty days after the debtor receives delivery of the collateral"); *id.* § 554.9507(3)(*a*) (providing a financing statement that becomes seriously misleading due to a debtor's name change still perfects an interest "in collateral acquired by the debtor before, or within four months after, the change").

These provisions from chapter 554 stand in stark contrast to the phrase "within thirty-one days after the date that the farmer purchases the agricultural supply" in section 570A.4. In both section 554.9317(5) and section 554.9507(3), the legislature used both the word "before" and the phrase "within . . . after." This suggests only post-event occurrences

take place within a certain amount of time after the event; if that were not the case, the word "before" would be superfluous. Put another way, these two provisions indicate the legislature knows how to include pre-event occurrences when it wants to do so, and the word "within" does not alone effect such an inclusion. As we explained almost ninety years ago, when we interpret statutory language, even "indulgence in the doctrine of generous construction cannot be permitted to . . . extend[] the meaning of words so far that it amounts to the addition of new ones." *Peterson Co. v. Freeburn*, 204 Iowa 644, 646, 215 N.W. 746, 748 (1927). Because section 570A.4 does not say "before or within thirty-one days after the date that the farmer purchases the agricultural supply," we reject Oyens Feed's contention that a financing statement filed under the section can perfect an agricultural supply lien for purchases of agricultural supplies occurring after the financing statement is filed.

4. *Answer to question one.* We answer "yes" to question one. We conclude an agricultural supply dealer's financing statement cannot perfect a lien under section 570A.4 for quantities of feed sold on credit after the statement is filed. Instead, the agricultural supply dealer's financing statement only perfects a lien for the feed purchases occurring during the thirty-one days preceding the filing of the financing statement.[1] *See* Iowa Code § 570A.4(2). This interpretation of section 570A.4(2) best accommodates the interrelationship between chapter 554 and chapter 570A and the legislative compromise underlying the 2003 amendments incorporating chapter 570A into article 9.

---

[1]We do not suggest every sale must generate a new financing statement. For example, a supply dealer who sells feed on credit every week—say, on May 1, 8, 15, 22, and 29—could perfect a lien as to all amounts sold in that month by filing a financing statement on the last day of the month.

**B. Question Two: Acquisition Price.** Section 570A.5(3) limits a feed supplier lien's priority to "the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater." Iowa Code § 570A.5(3). Chapter 570A "provides no definition of the term acquisition price." *Coastal Plains Pork*, 2012 WL 6571102, at *5 (applying Iowa law). Commentators writing soon after the original enactment of chapter 570A suggested section 570A.5(3) "may cause consternation in the financial institution community" because "it appears that where there is existing livestock with no acquisition price, the secured creditor will stand behind a verified lien to the full extent of the value of the feed consumed." Salsbery & Juhl, 34 Drake L. Rev. at 377–78.

We agree with the commentators that section 570A.5(3) allows an agricultural supply dealer with a perfected lien on a farrow-to-finish producer's herd to assert superpriority to the full extent of the value of feed purchased because we conclude animals born and raised in the farmer's farrow-to-finish operation have no "acquisition price" as that term is used in section 570A.5(3).

Primebank contends the legislature's use of the term "acquisition" rather than the "purchase" or "sale" price means acquisition price necessarily includes a farmer's overhead costs and costs of production such as transportation, labor, and semen. However, we conclude Primebank's argument conflates acquisition price with acquisition cost. *Cf.* David Frisch, *UCC Section 9-315: A Historical and Modern Perspective*, 70 Minn. L. Rev. 1, 55 (1985) (disputing that "cost was intended to mean acquisition price" because the UCC's "drafters knew how to use the term price when they wished to do so"); William E. Hogan, *Financing the*

*Acquisition of New Goods Under the Uniform Commercial Code*, 3 B.C. Indus. & Com. L. Rev. 115, 153 n.151 (1962) (noting the UCC generally does not define "costs," but "an argument that the term includes more than acquisition price . . . may be made from the fact that elsewhere the Code uses terms clearly indicating 'price' "). Furthermore, we conclude Primebank's formulation of "acquisition price" would require detailed and elaborate recordkeeping and accounting of every conceivable cost— including variable items like utility bills and facilities depreciation— incurred by a farmer in raising a constantly changing group of animals and would frustrate the legislature's intent "to encourage a fluid feed market without burdening cooperatives and farmers." *Oyens Feed*, 808 N.W.2d at 194.

Our resolution of this issue is also influenced by the notions that one can incur a cost unilaterally and that a price tends to involve two parties exchanging something. The Black's Law Dictionary definition of "price" refers to a sales transaction and the amount of money that changes hands. *Price*, Black's Law Dictionary (10th ed. 2014). The bankruptcy court here noted Crooked Creek's pigs came into the farrow-to-finish operation without a purchase, sale, or exchange.

The phrase "acquisition price" appears in one other chapter of the Iowa Code: chapter 6B, detailing the power of eminent domain. Section 6B.59 provides that if an acquiring agency uses eminent domain power to acquire property and later sells that property "for more than the acquisition price paid to the landowner," the agency must pay the landowner the difference between what it paid to acquire the land and what it received in the sale. Iowa Code § 6B.59. In the eminent domain context, the phrase "acquisition price" appears to refer only to the amount of money that exchanged hands, not that amount plus the

acquiring agency's other costs incurred for labor, inspectors' services, surveyor fees, appraiser charges, and the like. We reach a similar conclusion with respect to the meaning of acquisition price in chapter 570A.

Our conclusion does not write acquisition price out of the statute or substitute the word "purchase" in place of "acquisition." One can imagine a hypothetical transaction that *does* have an acquisition price but no purchase price. In our hypothetical scenario, two farmers raise both cows and pigs, but each decides to focus prospectively on just one or the other. One farmer trades his or her pigs for the other farmer's cows, and vice versa. Neither farmer has purchased the other's animals because no currency exchanged hands, but each farmer *has* acquired new livestock. The acquisition price paid by each farmer could be established by proving the market value of the respective farmer's animals at the time of the trade.

We answer "yes" to question two. Livestock born in Crooked Creek's farrow-to-finish operation had a zero acquisition price for purposes of Iowa Code section 570A.5(3).

**V. Conclusion.**

We answer both certified questions in the affirmative. We return this case to the federal district court for further proceedings consistent with this opinion.

**CERTIFIED QUESTIONS ANSWERED.**