# IN THE SUPREME COURT OF IOWA

No. 21–0774

Submitted November 17, 2022—Filed January 13, 2023

**QUALITY PLUS FEEDS, INC.,**

Appellee,

vs.

**COMPEER FINANCIAL, FLCA,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Monroe County, Daniel P. Wilson, Senior Judge.

An agricultural supply dealer seeks further review of a court of appeals decision affirming in part and reversing in part a district court's grant of summary judgment in a lien priority dispute. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all participating justices joined. May, J., took no part in the consideration or decision of the case.

Dustan J. Cross (argued) and Rick J. Halbur of Gislason & Hunter LLP, New Ulm, Minnesota, for appellant.

Thomas D. Story (argued) (until withdrawal), Alexander M. Johnson, and Jennifer E. Lindberg of Brown, Winick, Graves, Gross, and Baskerville, P.L.C., Des Moines, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

Since the farm crisis of the 1980s, Iowa law has allowed agricultural suppliers to claim a lien on livestock consuming their products and has granted this lien priority over previously perfected liens in some circumstances. *See* Iowa Code § 570A.5(3) (2020). Here, a supplier furnished feed to two dairy farms that were related but separate legal entities; the supplier did not receive payment for the feed. About a year later, the farms closed down, and all the remaining cows and milk were sold. Relying on the agricultural supplier's lien statute, the supplier brought a foreclosure action to recover the amount of its unpaid bills from the sale proceeds. The district court granted the supplier's summary judgment motion, rejecting the arguments of a financial institution which had a much larger unpaid loan balance and a previously perfected blanket lien as to both farms. The court of appeals reversed that grant of summary judgment and remanded.

On further review, we affirm the district court for the most part. We find that the supplier was entitled to summary judgment enforcing its lien on the proceeds from one of the two farms. As to the other farm, there is one issue of fact. Under the statute, the supplier is entitled to enforce a superpriority lien only to "the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater." *Id.* On this summary judgment record, we cannot say whether the cattle sale and milk sale proceeds from the

livestock that consumed the supplier's feed, minus the acquisition price of those livestock, exceeded the amount of the supplier's unpaid bill from that farm. We do not read Iowa Code chapter 570A as incorporating a special standard of proof one way or another. To foreclose its lien as a superpriority, the supplier need only offer proof enabling a fact finder to conclude that the underlying statutory requirements have been met. The proof here does not allow that determination to be made as a matter of law as to one of the farms.

We further agree with the district court that the supplier was entitled to summary judgment on the financial institution's affirmative defenses, and we hold that the financial institution is entitled to summary judgment as to the milk sale proceeds generated by a third dairy farm. Accordingly, we affirm the district court in part, reverse it in part, and remand for further proceedings consistent with this opinion.

## II. Background Facts and Proceedings.

Our case is a priority dispute between two creditors, Compeer Financial, FLCA (Compeer), and Quality Plus Feeds, Inc. (Quality Plus). The debtors are Etcher Family Farms, LLC (EFF), Etcher Farms, Inc. (EFI), and Elmwood Farms, LLC. We refer to them collectively as the "Etcher Entities" or "Etcher." The Etcher Entities operated dairy farms in Henry County (EFF), Monroe County (EFI), and the State of Illinois (Elmwood) until early 2019.

**A. Compeer's and Quality Plus's Dealings With the Etcher Entities.** Compeer is a federal land credit association in the business of financing agricultural operations. From late 2014 through early 2019, Compeer extended

credit to the Etcher Entities. The loans from Compeer were secured by both real property and personal property, including a blanket security interest in all of the Etcher Entities' livestock and milk and proceeds therefrom. Compeer perfected its personal property security interests between December 11, 2014, and March 4, 2016, by filing UCC financing statements with the Iowa Secretary of State.

By late 2016, the Etcher Entities were struggling financially. The situation deteriorated to the point that in October 2017, Compeer accelerated the entire Etcher Entities' debt. By then, the total sum owed exceeded $16 million. To continue to operate, Etcher purchased feed on credit. Quality Plus sold feed on credit to EFF and EFI, including mixes designated "calf starter," "big heifer," and "dry cow." Quality Plus filed financing statements with the Iowa Secretary of State commencing on October 5, 2017, and continuing thereafter. Iowa Code § 570A.4. The financing statements identified the collateral in relevant part as "all cows now owned by debtor," "all milk produced from said cows," and "proceeds and/or product thereof." Quality Plus provided feed to EFF for which it wasn't paid from September 25, 2017, through March 29, 2018, and it provided feed to EFI for which it wasn't paid from July 28, 2017, to March 30, 2018.

On March 19, 2018, each of the Etcher Entities filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Iowa. The cases were consolidated. Etcher was unsuccessful in

reorganizing its debts, and Compeer filed a motion to dismiss the consolidated bankruptcy case. The bankruptcy was dismissed on or about January 10, 2019.

Meanwhile, Etcher continued to sell milk to their sole customer, Dairy Farmers of America (DFA). DFA issued checks totaling $317,308.51 from April to May 2019 for milk produced by cows at EFF, EFI, and Elmwood. The checks were joint checks naming Compeer and Quality Plus as additional payees. Compeer and Quality Plus were already disputing their relative priorities as to the milk proceeds. Currently, the $317,308.51 in proceeds are being held in trust pending resolution of this case. Of these proceeds, $149,683.32 came from the sale of EFF milk, $54,071.88 came from the sale of EFI milk, and $113,553.31 came from the sale of Elmwood milk.

Ultimately, Etcher was forced to close, and all of their remaining cattle were sold. EFF's 1,223 remaining cattle sold for a total of $714,764.55; EFI's 1,055 remaining cattle sold for a total of $313,139.54. Although EFI was a breeding facility with calves, heifers, and bulls, at least $83,185.80 of the EFI dispersal sale proceeds came from sales of cows.

**B. The Etcher Cattle Herds Over Time.** Quality Plus submitted an affidavit from an individual who worked as a nutritionist-consultant for Etcher. He attested that based on his experience and his review of detailed animal-by-animal records at EFF, 677 of the 1,223 cattle that were sold by EFF in March and April 2019 would *also* have been at EFF at some point from November 2017 through March 2018 and would have consumed Quality Plus feed.

Compeer provided an affidavit as to what happened to the Etcher herds over time. On June 30, 2017, EFF had 1,222 cattle and EFI had 3,354 cattle. By the end of March 2018, when Quality Plus stopped providing feed, the numbers had declined slightly so that EFF had 1,211 cattle and EFI had 3,339 cattle.

At the end of 2018, the EFI herd numbers had declined sharply: EFF had 1,282 cattle and EFI had only 1,559 cattle. Many cattle had died or been culled. Compeer also provided a table showing that as of March 31, 2018, EFF had 684 self-raised cows and 527 cows purchased from EFI. By September 30, 2018, EFF had 516 self-raised cows and 644 cows purchased from EFI. Also, at some point EFF purchased 117 cows from an unknown source.

Compeer also submitted a table showing that EFI's herd was 100% self-raised. Notably, Quality Plus provided "calf starter" feed to EFI, which was the farm where Etcher bred and raised calves during 2017 and 2018. As EFI heifers matured, they would be sold or transferred into the herds of cows maintained by EFF, EFI, or Elmwood. Compeer's table also indicated that in April 2018, EFI made an unexplained downward inventory adjustment of 259 cattle.

**C. Proceedings in the District Court and the Court of Appeals.** On March 13, 2020, Quality Plus filed a petition in the Monroe County District Court to foreclose its feed lien on the $1,027,904.09 of cattle sale proceeds and the $317,308.51 of milk sale proceeds. Quality Plus sought to recover a total of $348,306.30 from the proceeds, based on an unpaid balance of $239,437.81 for feed supplied to EFF and $108,868.49 for feed supplied to EFI.

Compeer answered, denying Quality Plus's asserted right of foreclosure and asserting affirmative defenses and a counterclaim for foreclosure of its blanket security interest on the proceeds. As a legal matter, Compeer did not dispute the priority of a feed lien as provided in Iowa Code section 570A.5 over a prior perfected security interest obtained by a regular lender. However, Compeer argued that Quality Plus had not properly established that it had a superior feed lien totaling $348,306.30 in the proceeds. At bottom, Compeer maintained that Quality Plus failed to trace its lien from the EFF and EFI livestock that received its feed in the fall and winter of 2017–2018 to the livestock that were actually sold and generated cash proceeds in March and April 2019. Compeer also urged that Quality Plus had failed to establish the acquisition prices of the cattle sold in 2019, noting that the lien is limited to "the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater." Iowa Code § 570A.5(3). Further, Compeer maintained that there should be deductions taken from Quality Plus's feed lien for $25,000 in adequate protection payments that Quality Plus received during the automatic stay and for $65,870.59 based on actions taken by Quality Plus to perfect the lien in violation of the automatic stay.

The parties then filed cross-motions for summary judgment. After a hearing, the court granted Quality Plus's motion for summary judgment and denied Compeer's motion. It entered a judgment for $348,306.30 in Quality Plus's favor.

The district court reasoned, first, that Iowa Code section 570A.3 "does not require a meticulous showing of the path from feed to a specific cow." Rather, "a party asserting a lien must show a reasonable link between the feed provided by the supplier and the livestock."

Next, the court reasoned that although a dispute existed "regarding the number or identity of cows to which the agricultural supply dealer lien could attach," there was no dispute that Quality Plus sold feed to the Etcher Entities that their cattle consumed.

The court also rejected Compeer's affirmative defenses. It concluded that Compeer had waived the adequate protection payments issue by failing to counter Quality Plus's briefing on the point; in any event, adequate protection payments do not result in deductions from the principal amount of the lien. The court also concluded that the automatic stay under bankruptcy law does not prohibit a creditor from taking postfiling action to perfect a superpriority lien. Lastly, the court denied Compeer's cross-motion for summary judgment.

Compeer appealed, and we transferred the case to the court of appeals.

The court of appeals affirmed in part, reversed in part, and remanded. The court of appeals determined that there were "too many questions left unanswered to permit granting summary judgment to either party," stating:

> Navigating the competing priority rules in Iowa Code chapters 554 and 570A is a somewhat complex and fact-intensive exercise. In this case, it requires consideration of which entities' cattle were supplied with Quality Plus's feed and what happened to those cattle, as the lien attaches only to the cattle consuming the feed and their proceeds. To the extent Quality Plus asserts a lien in proceeds, the proceeds would need to be identifiable and traced to subsequent assets. This would not require burdensome and intensive

recordkeeping documenting a separate lien on each animal for the amount of feed that animal consumed, but it requires some level of identification of the proceeds. Identifying the proceeds here requires answers to questions about such things as whether cattle that consumed Quality Plus feed were sold, whether replacement cattle were purchased, or whether the cattle ended up in the Elmwood herd. An additional unsettled question is what the purchase price was, if any, for the cattle sold by EFF and EFI that generated the sale proceeds fought over here. This is important because Quality Plus could only get priority over Compeer's prior, perfected security interest "to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater." While some of the cattle sold may have been born into the herd, thus giving them an acquisition price of zero, it has not been conclusively established whether all or just some of the cattle sold were born into the herd. Whether any cattle in the herd were purchased and, if so, what the acquisition price was are additional fact questions for which no answer is definitively provided. These unanswered questions contribute to the need to deny summary judgment.

To some degree, Quality Plus seems to acknowledge that some of the questions listed above remain unanswered. Quality Plus seeks to sidestep this problem by suggesting that resolution of these questions is not a *material* question of fact. It argues that, because the size of the contested pot ($1,345,212.60) is so much bigger than the claimed lien ($348,306.30), even if the unanswered questions are resolved in Compeer's favor, all it will do is reduce the size of the contested pot, but not to the point that the pot is too small to cover the claimed lien. So, Quality Plus argues, the disputed facts are not material, because they will not change the outcome. While we agree that the end result may be that resolution of these factual disputes does not change the outcome, it is speculative to reach that conclusion based on this record. The unanswered questions create a genuine issue as to whether the contested pot is indeed bigger than the claimed lien. We will not speculate in order to grant summary judgment.

(Footnotes omitted.)

Quality Plus filed an application for further review, which we granted.

### III. Standard of Review.

We review rulings on statutory interpretation for correction of errors at law. *Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 76 (Iowa 2022). We review a district court ruling on a motion for summary judgment for correction of errors at law. *EMC Ins. Grp. v. Shepard*, 960 N.W.2d 661, 668 (Iowa 2021).

### IV. Analysis.

**A. The Chapter 570A Agricultural Supply Lien.** Iowa Code chapter 570A creates a statutory lien in favor of agricultural suppliers. This statute was enacted in 1984 and is generally believed to have been a response to the farm crisis of the early 1980s. *Oyens Feed & Supply, Inc. v. Primebank* (*Oyens I*), 808 N.W.2d 188–89 (Iowa 2011). "Farmers' assets were often encumbered by lender security interests, making agricultural suppliers hesitant to sell seed, feed, or other products to farmers on credit." *Id.* at 189. To solve this dilemma, and to "encourage the credit sale of agricultural supplies," the legislature decided to give agricultural suppliers a statutory lien in a farmer's crops and livestock with priority over the prior perfected security interests of financial lenders. *Id.*

Iowa Code section 570A.3 states that "[a]n agricultural supply dealer who provides an agricultural supply to a farmer shall have an agricultural lien" for "the amount owed to the agricultural supply dealer for the retail cost of the agricultural supply." In the case of feed for livestock, the lien applies to "[l]ivestock consuming the feed." *Id.* § 570A.3(2). The lien has priority "over an earlier perfected lien or security interest to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at

the time the lien attaches or the sale price of the livestock, whichever is greater." *Id.* § 570A.5(3). Where the livestock were born in the farmer's facility, their acquisition price is zero. *Oyens Feed & Supply, Inc. v. Primebank* (*Oyens II*), 879 N.W.2d 853, 864–66 (Iowa 2016).

In two separate cases entitled *In re Schley*, the United States Bankruptcy Court for the Northern District of Iowa resolved two legal points concerning Iowa Code chapter 570A: *In re Schley* (*Schley I*), 509 B.R. 901 (Bankr. N.D. Iowa 2014), and *In re Schley* (*Schley II*), 565 B.R. 655 (Bankr. N.D. Iowa 2017). We agree with both of those decisions.

First, in *Schley I*, the bankruptcy court concluded that the agricultural supply lien—like other security interests—extends to proceeds. 509 B.R. at 912. The court reasoned,

> Giving an agricultural supply dealer a lien that can only be enforced against the collateral (in this case, the pigs) but not the proceeds of that collateral could lead in many circumstances—like this one—to provide little protection for the agricultural supplier. Such a reading certainly would encourage agricultural suppliers to engage in some behaviors that are contrary to the purposes of the statute noted in [*Oyens I*]. It would leave those suppliers with little or no practical protection and would discourage—rather than encourage—them from working with troubled farmers. Even if they decided to work with troubled farmers, their incentive would be to race to the courthouse for repossession before the collateral is sold and reduced to proceeds. This is directly at odds with the purposes of the statute clearly articulated by [*Oyens I*].

*Id.* at 912–13. The court also noted that by tying the lien amount to "the sale price of the livestock," the legislature must have recognized that the lien attaches to sale proceeds. *Id.* at 914 (quoting Iowa Code § 570A.5(3)).

Then, in *Schley II*, the bankruptcy court had to decide whether the "lien applies pro rata to each [animal] for the amount of feed each [animal] consumed," or whether there is a single lien extending to all the livestock of the farmer that consumed any of the supplier's feed. 565 B.R. at 660. The bankruptcy court held, and we concur, that the latter interpretation of chapter 570A is the correct one. *See id.* at 660–61. The statute indicates that "[t]he amount of the lien shall be the amount owed to the agricultural supply dealer for the retail cost of the agricultural supply," and it applies to "[l]ivestock consuming the feed." Iowa Code § 570A.3; *id.* § 570A.3(2). In other words, there is *one lien* (singular) that attaches to *livestock* (singular or plural). We also agree with the bankruptcy court that animal-by-animal pro rata liens would frustrate legislative intent:

> Here, the Bank's proposed interpretation would frustrate the intent behind chapter 570A. It would discourage a fluid feed market because of the burden on agricultural supply dealers to document a separate lien on each animal for the amount of feed that that animal consumed. The potential limit agricultural supply dealers would face on their liens if unable to track the amount of feed each animal consumed would discourage them from supplying feed to fully leveraged farmers. To safely establish such a lien would involve burdensome and intensive recordkeeping, feed separation between livestock, and ongoing "detailed and elaborate records" of how much feed each animal consumed. These consequences would be contrary to the legislature's intent.

565 B.R. at 661.

Significantly, though, in *Schley I*, the court denied the feed supplier's motion for summary judgment seeking to enforce its superpriority lien against livestock sale proceeds. 509 B.R. at 907. The dealer argued there was no dispute that it had provided feed to the debtors which the debtors fed to their pigs. *Id.* at 906. However, the debtors had two operation sites and two feed suppliers and

had only sold 1,490 out of their 3,061 livestock. *Id.* at 907. As the court explained, "Since it is unclear whether Debtors fed WFS feed to the 1,490 pigs Debtors sold, there is a genuine dispute of material fact whether WFS has an agricultural lien." *Id.*

**B. Was Quality Plus Entitled to Summary Judgment Enforcing a $348,306.30 Agricultural Supply Lien Against the Proceeds from the Sales of Cows and Milk?** We must now decide whether Quality Plus established a priority lien (or more accurately liens) in the proceeds as a matter of law. The district court framed the issue as one of statutory interpretation and concluded that under chapter 570A, the agricultural supply dealer need only establish "a reasonable link" between the feed supplied and the livestock in question. The court of appeals treated the issue as one of summary judgment proof and identified a series of "unanswered questions" necessitating reversal and remand for trial.

We decline to follow either of these two paths. Unlike the district court, we do not believe chapter 570A comes with its own relaxed standard of proof. A lien is a lien; summary judgment is summary judgment. Nothing in chapter 570A indicates that anything other than the customary litigation burdens of proof apply to agricultural lien cases. But unlike the court of appeals, we do not believe that numerous fact issues pervade this proceeding. In fact, our review of the record discloses only one genuine issue of material fact.

1. *Framing the summary judgment issues.* On summary judgment, the first question to ask is whether Quality Plus, which would have the burden of proof

at trial, established a prima facie case based on the affidavits and other record evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (explaining that summary judgment should be granted where the evidence would require the granting of a directed verdict for the moving party at trial). There were two separate entities (EFF and EFI) operating at two separate locations (New London and Lovilia, respectively) to which Quality Plus supplied feed. Quality Plus invoiced each entity separately for the purchase price of its feed. Quality Plus's petition contains separate foreclosure counts against EFF and EFI.

The EFF pot of proceeds totals $864,447.87, after combining the EFF cattle dispersal sales and the EFF milk sales. The EFI proceeds pot comes to $367,211.42.

Quality Plus must first prove up its claimed liens of $239,437.81 for EFF and $108,868.49 for EFI. Then, to establish a superpriority as to EFF, Quality Plus must show that at least $239,437.81 of the $864,447.87 EFF proceeds pot were derived from cattle that consumed feed it supplied to EFF (netting out the acquisition cost of such cattle from the proceeds). For EFI, Quality Plus must prove that at least $108,868.49 of the $367,211.42 EFI proceeds pot were derived from cattle that consumed feed it supplied to EFI (again netting out the acquisition cost of such cattle from the proceeds).

We have previously decided one case dealing with the tracing of proceeds in the context of a superpriority. In *Citizens Savings Bank v. Miller*, a dispute arose as to whether the plaintiff could claim a purchase money security interest (PMSI) in fifteen dairy cattle as against a previously perfected blanket lien.

515 N.W.2d 7, 8–9 (Iowa 1994). A PMSI, like a feed lien, is a form of superpriority. *See* Iowa Code § 554.9324(1). Special status is accorded to the PMSI based on the familiar rationale that the PMSI holder—like the feed supplier—has provided added value to the herd, specifically by providing funds enabling the purchase of additional cattle. In *Citizens Savings*, we held that because the original fifteen cattle subject to the PMSI were no longer in the herd, the plaintiff had the burden of proving which cattle had been received on the disposition of those original fifteen cattle. 515 N.W.2d at 9. As we explained:

> To successfully claim PMSI priority on this ground, however, the proceeds must be identifiable. This would require proof that fifteen cattle currently in the [defendant's] herd are traceable to those originally encumbered by [the plaintiff's] lien. Given the passage of time, [the plaintiff] concedes its inability to make that identification.

*Id.* (citations omitted). Under those circumstances, we affirmed summary judgment for the blanket lienholder. *Id.*

Assuming the record here allows tracing to occur, the next question is whether the record, including the affidavits and evidence submitted by Compeer, would also support a reasonable inference that less than $239,437.81 of the proceeds were derived from cattle that consumed feed supplied to EFF (after netting out acquisition cost) and less than $108,868.49 were derived from cattle that consumed feed supplied to EFI (again after netting out acquisition cost). *See* Iowa Code § 570A.5(3). In that event, there would be a genuine issue of material fact.

2. *Deciding the summary judgment issues.* We now turn to the record. Quality Plus offered proof, without rebuttal, that it supplied $239,437.81 worth

of feed to EFF for which it was not paid and $108,868.49 worth of feed to EFI for which it was not paid. Quality Plus also offered proof that the feed it supplied to EFF was consumed by EFF cattle. Even without separate proof, it is only logical to infer that the feed supplied to EFI was consumed by EFI cattle.[1] So Quality Plus has established a prima facie case that it is entitled to a superpriority lien on the cattle that were on the EFF and EFI farms from late 2017 through early 2018 when it supplied feed for which it wasn't paid.

Additionally, Quality Plus offered proof through the nutritionist-consultant's affidavit that just over half of the cattle liquidated by EFF in the spring of 2019 (677 out of 1,223 cattle, or 55%) had consumed Quality Plus feed for which Quality Plus had not been paid. The summary judgment record likewise supports the inference that at least the same percentage of EFI cattle sold in the spring of 2019 had consumed the Quality Plus feed previously supplied to EFI a year or so earlier. In fact, the summary judgment record indicates that animals were transferred *out of* EFI, but not *into* EFI, during 2018. The only new animals would have been newborn calves.

As for acquisition price, the record indicates that approximately half of EFF's cattle would have had an acquisition price of zero because they were self-raised. Meanwhile, all of EFI's cattle were self-raised and therefore had an acquisition price of zero.

---

[1]Compeer questions whether Quality Plus's affiants were competent to make the statements set forth in their affidavits. We conclude they were. One was a nutritionist-consultant who had direct experience at Etcher. The other was an accountant for Quality Plus. They both laid foundation for certain documents and then highlighted certain information within those documents.

All told, the cash proceeds from the sale of EFF cattle and milk amounted to $864,447.87—with $714,764.55 in cattle proceeds and $149,683.32 in milk proceeds. This is around three-and-a-half times the amount of Quality Plus's asserted $239,437.81 superiority lien as to EFF. Meanwhile, the cash proceeds from the sale of EFI cattle and milk amounted to $367,211.42—with $313,139.54 in cattle proceeds and $54,071.88 in milk proceeds. This is around three-and-one-third times the amount of Quality's Plus asserted $108,868.49 superpriority lien as to EFI.

Starting with EFI, we find no genuine issue of material fact that Quality Plus has established a superpriority lien of $108,868.49 as to the EFI cattle and milk proceeds. EFI's livestock had an acquisition price of zero. Further, the record shows that at least $83,185.80 of the EFI cattle proceeds came from sales of cows. Obviously, the $54,071.88 in EFI milk proceeds also were derived from cows. Any animal classified as a cow would have been on the EFI farm at least a year before, i.e., during the relevant period when Quality Plus supplied feed. Compeer has offered no proof to the contrary. So, there is no dispute that there are proceeds subject to Quality Plus's EFI lien ($83,185.80 plus $54,071.88, for a total of $137,257.68) sufficient to cover the full amount of that lien ($108,868.49). This part of the district court's summary judgment order should be upheld.

Turning to EFF, Quality Plus has shown that 55% (677 out of 1,223) of the cattle sold at the dispersal sales consumed Quality Plus feed during the relevant time period. We can infer that about 55% of the milk also would have come from

those cattle. Meanwhile, Quality Plus's EFF lien only comes to 28% of the EFF cattle and milk proceeds ($239,437.81 of $864,447.87). Therefore, at first blush, there should be plenty of available proceeds to cover that lien.

However, we don't know the acquisition price of the 677 cattle. The record indicates that some of those cattle would have been self-raised and some would have been purchased from EFI. We are unable to conclude as a matter of law that the sale—or market—price of the 677 cattle exceeds their acquisition price by at least $239,437.81. *See* Iowa Code § 570A.5(3) (stating that superpriority is available "to the extent of the difference between the acquisition price of the livestock and the fair market value of the livestock at the time the lien attaches or the sale price of the livestock, whichever is greater").

"Generally, in an action to enforce an agricultural lien, the plaintiff has the burden of establishing all elements of his or her cause of action." 3 C.J.S. *Agriculture* § 151, at 249 (2013); *cf. Sulzberger Excavating, Inc. v. Glass*, 351 N.W.2d 188, 192 (Iowa Ct. App. 1984) ("The burden of proof is upon the mechanic's lien claimant."). The wording of Iowa Code section 570A.5(3) indicates that "the extent of the difference" between acquisition price and either market or sale price is part of the lienor's cause of action. This does not mean that mathematical precision is required. It does mean that evidence would have to be presented below, either on a renewed summary judgment motion or at trial, from which a reasonable fact finder might conclude that the foregoing difference as to the 677 cattle exceeds $239,437.81. We must reverse the district court's summary judgment as to the EFF cattle and milk proceeds.

We see no reason to disturb the summary judgment on Compeer's affirmative defenses. We agree with the district court that Compeer failed to preserve the adequate protection payment issue by not briefing it below.[2] We also agree that bankruptcy law permitted Quality Plus to perfect its agricultural dealer supply lien postpetition without violating the automatic stay. Section 362(b)(3) of the Bankruptcy Code allows the perfection of a lien covered by section 546(b) even after the bankruptcy filing. *See* 11 U.S.C. § 362(b)(3) (excepting from the automatic stay "any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title") Section 546(b)(1)(A) refers to "any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection." This is a complicated way of saying that the automatic stay does not prohibit a secured creditor from taking steps after the bankruptcy filing to perfect a lien that, under generally applicable law, would be superior to a previously perfected lien. *See, e.g., In re Aznoe Agribiz, Inc.*, 416 B.R. 755, 764–66 (Bankr. D. Mont. 2009) (holding that a supplier's postpetition actions to perfect a superpriority agricultural lien did not violate the automatic stay).

---

[2]Compeer also argues on appeal that $27,304.07 should be deducted from the EFI feed lien because no financing statement was filed within thirty-one days of those sales as required by Iowa Code section 570A.4(2). We agree with Quality Plus that this argument was not preserved below, either.

Finally, we agree with Compeer that it is entitled to the $113,553.31 in Elmwood milk proceeds currently being held in escrow. Quality Plus argues that some EFI cattle were transferred to Elmwood after consuming Quality Plus feed for which Quality Plus wasn't paid. However, we need not consider this matter further because under today's decision, Quality Plus's EFI superpriority lien will be fully satisfied out of the EFI cattle and milk proceeds.

**V. Conclusion.**

For the foregoing reasons, we vacate the decision of the court of appeals. We affirm in part and reverse in part the district court judgment and remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except May, J., who takes no part.