# In the Iowa Supreme Court

No. 24–1939

Submitted April 15, 2026—Filed June 12, 2026

**Janey Shafer,**

Appellant,

vs.

**Frank Santana,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Madison County, Terry Rickers, judge.

The defendant seeks further review of the court of appeals decision overturning the district court's dismissal of a personal injury suit. **Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Matthew J. Hemphill and Aiden R. Ruble of Bergkamp, Hemphill & McClure, P.C., Adel, and Jason Springer of Springer Law Firm, PLLC, Madrid, for appellant.

Brian T. Fairfield and Nicholas J. Huffmon of Brooks Law Firm, P.C., Rock Island, IL, for appellee.

**Christensen, Chief Justice.**

On further review, we must decide whether there was sufficient evidence of recklessness to avoid the immunity proscribed under the Domesticated Animal Activities Act. Iowa Code § 673.2 (2021). Because we find insufficient evidence to support recklessness, we vacate the decision of the court of appeals and affirm the district court's decision to dismiss the action.

### I. Facts and Background Proceedings.

As the case comes to us on a grant of summary judgment, we recite the factual circumstances in the light most favorable to the nonmoving party. *Brodie v. Foxhoven*, 21 N.W.3d 380, 383 n.2 (Iowa 2025).

Frank Santana was mowing his pasture with a horse-drawn sickle mower, while Jenny Shafer videoed him. After Santana concluded mowing, he dismounted from the mower and directed Shafer to hold the horses while he raised the sickle bar. Shafer held one of the horses by a lead rope attached to its halter, standing next to the horse on the side away from the sickle bar. The sickle bar dropped to the ground, spooking the horses. The horses initially moved backward, at which time Shafer yelled, "Whoa." The horses began moving forward, and Shafer fell down. The steel wheel of the sickle mower ran over her, and she was dragged several feet. She suffered severe injuries that required her to be in intensive care for two weeks and to spend over three months in a rehabilitation hospital in Colorado.

In preparation for litigation, Shafer retained Everett Kenoyer as an expert. Kenoyer was an eighty-two-year-old who had worked with draft horses and sickle mowers since he was twelve years old. As set out in Kenoyer's unsworn affidavit, he believed Santana dangerously operated the mower in four ways: (1) the mower was very rusty and would be difficult to operate, (2) the safety rod was not

properly secured to the wing nut, (3) the horses were not properly trained, and (4) nobody should have held the reins and if anybody was holding the reins, they should not have been in front of the horses. Kenoyer also believed Santana should have tied the horses' reins to a secure post and the horses should have been outfitted with blinders. Kenoyer opined that dropping the heavy sickle bar could "spook the horses, especially when at a standstill."

Shafer suffered catastrophic, permanent injuries to her spinal cord, leaving her paralyzed from the waist down. Her medical expenses exceeded $700,000. Shafer filed a personal injury suit against Santana, alleging damages of $18.2 million. The district court dismissed the suit after ruling Santana was immune from liability under the Iowa Domesticated Animal Activities Act. Shafer appeals.

**II. Analysis.**

Our review is for correction of errors at law. *Baker v. Shields*, 767 N.W.2d 404, 406 (Iowa 2009). Legal error is committed if the judge grants summary judgment in spite of a genuine issue of material fact. *See Crippen v. City of Cedar Rapids*, 618 N.W.2d 562, 565 (Iowa 2000) (en banc); *see also Baker*, 767 N.W.2d at 406.

On appeal, Shafer argues that Santana's conduct was not protected under the Domesticated Animal Activities Act, Iowa Code ch. 673. Alternatively, if chapter 673 immunity applies, Shafer argues that Santana's conduct falls under the recklessness exception identified in section 673.2(1). The court of appeals affirmed the district court's ruling that Santana's conduct was covered by the Domesticated Animal Activities Act; but it reversed the district court's ruling that there was no question of material fact regarding recklessness. After careful review, we agree with the district court on both grounds.

**A. Domesticated Animal Activities Act.** Under Iowa Code section 673.2, a domesticated animal owner "is not liable for the damages, injury, or death suffered by a participant or spectator resulting from the inherent risks of a domesticated animal activity." Relevant to this appeal, a domesticated animal activity includes "driving a domesticated animal." *Id.* § 673.1(3)(*a*).

In interpreting a statute, our goal is to effectuate the ascertainable intent of the legislature. *State v. Hensley*, 911 N.W.2d 678, 682 (2018). "We glean that intent by 'assess[ing] the statute as a whole, not just isolated words or phrases.' " *Id.* (alteration in original) (quoting *Oyens Feed & Supply, Inc. v. Primebank*, 808 N.W.2d 186, 193 (Iowa 2011)). "We look to both the language and the purpose behind the statute." *Oyens Feed & Supply, Inc.*, 808 N.W.2d at 193 (quoting *Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Mobil Oil Corp.*, 606 N.W.2d 359, 363 (Iowa 2000)). If a statute is unambiguous, "our inquiry stops there." *State v. Richardson*, 890 N.W.2d 609, 616 (Iowa 2017).

The Domesticated Animal Activities Act was enacted in 1997. 1997 Iowa Acts ch. 61 (codified at Iowa Code ch. 673 (Supp. 1997)). It was Iowa's contribution to a policy-making consensus that reached forty-eight states; the two exceptions were Maryland and California. *See* Faryn Fort, *The Udderly Problematic Beef Between States: Whether Employees Are Covered Under Equine and Farm Animal Liability Acts*, 62 S. Tex. L. Rev. 65, 70 (2022). Recognizing "that the equine and farm animal industries were valuable to the economy and warranted legal protection" following the demise of assumption of the risk as a defense to tort liability, the State of Washington enacted the United States' first equine animal liability act in 1989, with other states following suit. *Id.* at 69–70. These acts provide immunity from liability to owners of equine animals, with some acts expanding the immunity to other farm animals. *Id.* at 66–67.

"Summary judgment is an important procedure in statutory immunity cases because a key purpose of the immunity is to avoid costly litigation, and that legislative goal is thwarted when claims subject to immunity proceed to trial." *Nelson v. Lindaman*, 867 N.W.2d 1, 7 (Iowa 2015).

We agree with the court of appeals that Santana is entitled to the statutory immunity proscribed by the Act, but we nonetheless construe the statute differently. "Driving" is a term of art with special meaning within the statutory context of the Domesticated Animal Activities Act. This special meaning is not captured by simply applying generic dictionary definitions. In similar statutory immunity contexts, courts have defined driving as "a term of art generally used to describe the activity of an individual controlling the movement of an equine harnessed to a nonmotorized vehicle, such as a carriage." *Smith v. Lane*, 832 N.E.2d 947, 953 (Ill. App. Ct. 2005) (citing 4 *The New Encyclopedia Britannica* 228 (15th ed. 2003) (defining "driving")). The court of appeals erred when it equated the statutory meaning of "driving" under the Iowa Domesticated Animal Activities Act, Iowa Code § 673.1(3)(*a*), with a generic dictionary definition, instead of recognizing "driving" as a term of art within the equine community.

In spite of our different approach to determining the meaning of "driving" in this context, the court of appeals' end-of-day holding on this issue was correct. At the time of the injury, the horses were harnessed to the nonmotorized sickle mower, so Santana was engaged in the domesticated animal activity of driving. *See id.*; *see also Smith*, 832 N.E.2d at 953 (defining "driving" to include "controlling the movement of an equine harnessed to a nonmotorized vehicle"). The fact that Santana had finished mowing and stopped the horses to secure the sickle bar does not mean, as Shafer argues, that he was no longer engaged in the activity of driving the horses. Shafer's position parses the equine activity of

driving too thin. The horses were still harnessed to the sickle mower as Santana attempted to secure the sickle bar so that he could then drive them back to the barn to unhitch the mower. *See Smith*, 832 N.E.2d at 953. A contrary conclusion would mean that liability turns on whether the horses were standing still or were moving, in other words, whether there was a brief pause in the specific activity or whether the activity had resumed.

The court of appeals rejected a similar argument in a related context involving a parade spectator who was struck by a runaway pony when she attempted to cross the street during a parade in *Snider v. Fort Madison Rodeo Corp.*, No. 00–2065, 2002 WL 570890 (Iowa Ct. App. 2002). In that case, the court held: "In order to meet the clear design of chapter 673, the parade must be seen in its entirety and its participants given protection from liability for injuries sustained by any domesticated animal activity occurring during the course of the parade on the designated parade route." *Id.* at *4 (considering whether the spectator was "in a place where a reasonable person who is alert to the inherent risks of domesticated animal activities would not expect a domesticated animal activity to occur" under section 673.2(5) (quoting Iowa Code § 673.2(5) (1999))). The same is true here. The domesticated animal activity of driving a team of horses encompasses the entirety of that activity. Santana was still engaged in the activity of driving the team of horses when he stopped the horses so he could secure the sickle bar into place before continuing to drive the team back to the barn. *Cf. Adams v. Hare*, 536 S.E.2d 284, 286–88 (Ga. Ct. App. 2000) (holding that preparing a horse for a horse show by brushing and blanketing the horse before letting the horse out of a stall on the first day of the show "f[e]ll squarely within the terms of the Equine Activities Act" as part of the activity of an equine show); *Hellen v. Hellen*, 831 N.W.2d 430, 434–35 (Wis. Ct.

App. 2013) (rejecting argument under Wisconsin's equine liability statute that a participant engaged in " 'riding,' as an 'equine activity,' at the time of the injury-producing accident must show that he or she was on the back of a horse at the moment of the accident").

We conclude that the statutory immunity applies to Shafer's injuries, which "result[ed] from the inherent risks of [the] domesticated animal activity" of driving. Iowa Code § 673.2. At a minimum, Shafer was acting as a "spectator" of Santana's driving activity, i.e., she was "in the vicinity of a domesticated animal activity," *id.* § 673.1(13), when she stood holding the horses when the sickle bar fell to the ground, spooking the horses. Therefore, the statutory immunity proscribed by the act applies, and Shafer must be able to identify an exception under section 673.2 to avoid summary judgment.

**B. Recklessness.** The court of appeals ruled that Shafer's expert opinion had created a genuine issue of material fact as to whether Santana's conduct was reckless. Because there was no genuine issue of material fact regarding recklessness, the court of appeals erred.

We recounted the Iowa standard for recklessness earlier this term in *Rose v. Oakland Healthcare Management, LLC*, 30 N.W.3d 724 (Iowa 2026). There, we said that "the standard for recklessness is well-established in our caselaw" and "Iowa law imposes a high bar to establish recklessness; it is a difficult standard to meet." *Id.* at 729. Recklessness "means something more than 'the mere unreasonable risk of harm in ordinary negligence.' " *Id.* (quoting *Martinez v. State*, 986 N.W.2d 121, 125 (Iowa 2023)). To meet the standard, a plaintiff must prove "the actor intentionally performed an act of an unreasonable character, that the intentional act was in disregard of a known risk or risk so obvious that the actor should have known of it, and that the intentional act made

it highly probable that harm would follow." *Id.* To constitute recklessness, the act must be "not merely a departure from ordinary care but an 'extreme' departure." *State v. Sutton*, 636 N.W.2d 107, 111 (2001). Put another way, this is not about a bad call—it is about seeing the risk, choosing to go ahead anyway, and doing so in a way that makes real harm all but inevitable.

The court of appeals correctly noted that "[e]xpert opinions may 'give rise to a reasonable inference of recklessness.' " (Quoting *Penny v. City of Winterset*, 999 N.W.2d 650, 655 (Iowa 2023).) But even considering Kenoyer's unsworn written opinions as part of the summary judgment record,[1] they fall short of raising a jury question on recklessness. An expert opinion does not give rise to a reasonable inference of recklessness without a showing that the defendant intentionally committed an unreasonable act "[i]n disregard of a risk known to or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Penny*, 999 N.W.2d at 655 (quoting *Morris v. Leaf*, 534 N.W.2d 388, 391 (Iowa 1995)).

An expert's opinion may support recklessness in such a way that creates a question of material fact, but this has historically only been true where such

---

[1]Affidavits submitted in support or resistance to summary judgment must be sworn or otherwise certified under penalty of perjury. Iowa R. Civ. P. 1.981(5). Courts generally do not consider unsworn affidavits for purposes of summary judgment. *See Provident Life & Accident Ins. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) ("Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of [summary judgment], and may be disregarded by the court when ruling on a motion for summary judgment." (first alteration and omission in original) (quoting 11 *Moore's Federal Practice* § 56.14[2][c] (3d ed. 1997))); *accord Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) (collecting cases). Santana does not challenge the form of Kenoyer's report, presumably because Kenoyer testified in his deposition that at trial he would testify about all his written opinions. *See Maytag Corp.*, 448 F. Supp. 2d at 1065 ("Therefore, while an unsworn expert report, standing alone, does not constitute admissible evidence that can be considered at the summary judgment stage of the proceedings, and will not defeat a motion for summary judgment, an unsworn expert report may be considered at summary judgment where the opinions therein are otherwise adopted or reaffirmed in an admissible affidavit or deposition testimony by the expert."). We therefore consider Kenoyer's unsworn written report.

expert opinion indicates the defendant had disregarded a known risk. *See, e.g.,* *Feld v. Borkowski*, 790 N.W.2d 72, 80–81 (Iowa 2010). Expert materials are not typically necessary in determining what sorts of risks are obvious to an ordinary person. In *Feld v. Borkowski*, we established that an expert report could establish a material question on recklessness. *Id. Feld* involved a slow-pitch softball player who released a bat at an irregular angle, contacting the plaintiff and causing severe injury. *Id.* at 74–75. There, the expert affidavit analyzed the irregular flight path of the bat to infer a recklessness intent. *Id.* at 80. In other words, the affidavit evidenced the defendant's intentional disregard of a risk known to him. *Id.* In the present case, the expert materials provided by Kenoyer neither established that the risk was known to Santana nor that the risk was so obvious that he should have known.

Typically, we might look to a defendant's testimony to determine the degree of awareness of the risks generated by his conduct. However, Santana was never deposed, resulting in a record devoid of any evidence regarding his knowledge of the risks of operating the horse-drawn sickle mower. As stated in Shafer's own brief, her injuries were the result of an "unfortunate incident."

Read in the light most favorable to Shafer as the nonmoving party, the record supports that Santana grew up working with draft horses and used the team involved in the incident to pull a variety of implements, but he had only used them to pull the sickle mower three or four times. According to Shafer's expert, Santana lacked the requisite training and experience to operate a sickle mower safely or appreciate the risks involved, placing this case firmly into the category of ordinary negligence. Nothing in the record supports that Santana understood the risks involved with placing Shafer in front of the sickle mower

but then intentionally disregarded them. Nor does this risk appear so obvious that we are willing to impute Santana's knowledge of the risks.

In *Penny v. City of Winterset,* we considered a personal injury suit arising from an automobile collision at an intersection between the plaintiff and a police officer responding to a crime. 999 N.W.2d at 651–52. The plaintiff "sustained a traumatic brain injury, a lower-back fracture, and an injury to his right knee." *Id.* at 652. The plaintiff submitted two expert reports in an attempt to forestall summary judgment. *Id.* at 655. One expert report opined that the plaintiff was fully visible from the officer's vantage point. *Id.* The second expert report opined that the officer had proceeded too quickly to react appropriately at the intersection. *Id.* Ultimately, we ruled that the expert reports did not generate a fact question as to recklessness because the plaintiff had to show the officer had "conscious knowledge of a dangerous situation" and the officer "had no reason to predict that Penny would have proceeded through the intersection." *Id.* at 656. Here too, the record does not show that Santana had conscious knowledge of the dangerous situation he had placed Shafer in, and we are privy to no facts that indicate that the danger was so obvious that we should be willing to impute knowledge.

Expert testimony is not often particularly useful for determining which risks are obvious. An expert in horse-drawn sickle mowers, like Kenoyer, certainly might see the risks associated with Santana's operation of the sickle mower as obvious. However, nothing in Kenoyer's expert report bears on the question of recklessness. Unlike the expert affidavit in *Feld*, Kenoyer's report and deposition testimony did not conclude that Santana had acted "deliberately" in an "abnormal, contorted act of recklessness." 790 N.W.2d 72, 80 (Iowa 2010).

Kenoyer's expert materials indicated the injury was the result of a complicated chain of interwoven events: Santana directed Shafer to stand in front of the horses and hold them while he raised the sickle bar, the sickle bar fell due to an "unknown reason,"[2] causing a loud noise and spooking the horses. Shafer fell while trying to maintain control of the horses. Not mentioned in Kenoyer's expert report was that Shafer attempted to stop the horses from moving backward by pulling the horses forward.

Kenoyer opined that the sickle bar fell to the ground as a result of "the safety rod" not being "secured to the wing with the wing nut." He also opined that the horses lacked sufficient training and should have been outfitted with blinders. That the safety rod was improperly secured and the horses lacked sufficient training are reflective of garden-variety negligence, not recklessness. These risks are the sorts of things that are only obvious to experts with the benefit of hindsight, not to an ordinary person like Santana at the moment of the incident.

Nor did Kenoyer's opinion establish that any such risks were "so great as to make it highly probable that harm would follow." *Penny*, 999 N.W.2d at 655 (quoting *Morris*, 534 N.W.2d at 391). Shafer's expert expressed the following opinions: the sickle bar wing would not have fallen if the mower had a proper safety rod that was not rusted; the horses were "not trained enough" to pull the sickle mower, which he concluded was "obvious" from the fact that they spooked since properly trained horses would not have moved; the horses' reins should have been tied to the mower when Santana needed to get off the mower and should not have been held by anyone; if anyone was going to hold the horses, it

---

[2]The appellant's brief concedes that the cause of the falling sickle bar was unknown.

should have been done by holding the reins from behind the horses and next to the mower rather than in front of the wing; and it was "absurd" to ask anyone to stand in front of the horses to hold them. This led Shafer's expert to conclude:

> [I]t is obvious to me that the Defendant did not know what he was doing and did not have the experience needed to safely operate his sickle mower. Unless you grow up driving horses, have hours upon hours of instruction and experience, it makes no sense to me to be farming with a sickle mower because of the dangers. Further, involving someone else to assist a person that lacks the necessary experience in using a sickle mower is dangerous and unsafe.

But "dangerous and unsafe" does not establish that harm was highly likely to follow from Kenoyer's identified risks. The statutory immunity extends to "[i]nherent risks of a domesticated animal activity." Iowa Code § 673.1(11) (emphasis omitted). Inherent risks include "[t]he unpredictable reaction by a domesticated animal to unfamiliar conditions, including, but not limited to, a sudden movement; loud noise; an unfamiliar environment; or the introduction of unfamiliar persons, animals, or objects." *Id.* § 673.1(11)(*c*). Shafer had held the team of horses in a similar manner earlier in the afternoon when Santana stopped to introduce her to his neighbor, yet nothing happened then. There is no evidence in the record that the interwoven series of events that converged to cause Shafer's injuries was so highly likely to happen that a factfinder could conclude that Santana acted recklessly. On this record, the risks are no more than the inherent risks protected by the Act. *See id.* Therefore, the court of appeals erred when it held that there was a question of material fact with respect to recklessness.

### III. Conclusion.

The outcome here is a harsh one. Shafer's complaint, on its face, describes serious injuries allegedly caused by Santana's negligence, and we are not blind to the fact that she cannot use this forum to pursue her claim for damages.

However, the legislature has made a policy choice to grant negligent owners of domesticated animals immunity for injuries that flow from their animal's inherent unpredictability, and we are obliged to apply it.

After careful review, we must vacate the decision of the court of appeals and affirm the district court's judgment to dismiss the action.

**Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**